Argued and submitted February 5, affirmed April 25, 2001

In the Matter of
Kayla Marie Dennis, a Minor Child.

STATE ex rel STATE OFFICES FOR
SERVICES TO CHILDREN AND FAMILIES;
Jessie J. Robbins, aka Jessie J. Sheaffer;
and Kayla Marie Dennis,
*Respondents,*

*v.*

James DENNIS,
*Appellant.*

(J91-0324B; CA A110767)

25 P3d 341

Gerald Brask argued the cause and filed the briefs for appellant.

Judy Lucas, Assistant Attorney General, argued the cause for respondent State Offices for Services to Children and Families. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance for respondents Jessie J. Robbins aka Jessie J. Sheaffer and Kayla Marie Dennis.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

■ Father appeals from the trial court's denial of his amended motion to set aside a stipulated judgment for termination of his parental rights to child. Father assigns error on statutory, constitutional, and other grounds that are all generally related to his unanticipated inability to have ongoing contact with child following entry of the stipulated judgment. We review the record *de novo.* ORS 419A.200. We review the trial court's procedural rulings for abuse of discretion, *State ex rel SOSCF v. Williams,* 168 Or App 538, 540, 7 P3d 655 (2000), *rev allowed* 331 Or 633 (2001), and its legal conclusions for errors of law, *see State ex rel Upham v. McElligott,* 326 Or 547, 553-56, 956 P2d 179 (1998). We affirm.

Mother and father have never been married and currently do not share a residence. Child has been in the custody of Children's Services Division and its successor agency, State Office of Services to Children and Families (SCF),[1] since 1993, when she and her half-sister were removed from the custody of her mother.[2] Child and her half-sister lived with father and his wife and their children for approximately eight months in 1995. SCF removed child from father's care in November 1995 based, in part, on allegations of sexual abuse by father.

In 1998, after exploring and rejecting various custodial options, SCF determined that child and her half-sister could not be integrated into either mother's or father's home. SCF then filed petitions to terminate both parents' rights.[3] Shortly before trial, both parents agreed to allow relatives of mother to adopt child and her half-sister. Father entered into a "Post-Adoption Communication Agreement" (the post-adoption agreement) with the putative adoptive parents for him to retain minimal visitation rights with child both before and after the adoption was completed.

---

[1] Children's Services Division was renamed and restructured as SCF in 1995.

[2] Child's half-sister is not the biological child of father, but the two were very close in age and their cases were handled together by SCF and in many of the court proceedings.

[3] Mother's rights eventually were terminated; she is not a party to this appeal.

On December 15, 1998, father stipulated to a judgment terminating his parental rights. Father testified that, at the time he stipulated to the judgment, he believed that the judgment was contingent upon the performance of the post-adoption agreement. In early to mid-1999, after entry of the stipulated judgment terminating father's parental rights, SCF removed child and her half-sister from the home of the putative adoptive parents. SCF subsequently decided not to approve the adoption of the children by the putative adoptive parents.

In December 1999, father filed a motion to set aside the stipulated judgment terminating his parental rights to child on various grounds relating to the failure of the putative adoption and the resulting failure of the post-adoption agreement between father and the putative adoptive parents. The trial court then granted father a right of limited participation under ORS 419B.115 and appointed counsel for father. After hearing testimony, the trial court denied father's motion. Father appeals from that order and judgment. We first consider father's statutory arguments, followed by his arguments under the United States Constitution.

■ In his first assignment of error, father argues that the trial court erred in deciding his motion solely under ORS 419B.420.[4] According to father, the trial court was required to proceed under ORCP 71.[5] SCF asserts that the court did not err because, consistently with ORCP 1 A,[6] ORCP 71 does not apply in juvenile court proceedings under ORS chapter 419B.

---

[4] ORS 419B.420 provides that "[e]xcept as provided in ORS 419B.423 and 419B.426, the court may modify or set aside any order made by it upon such notice and with such hearing as the court may direct."

[5] ORCP 71 B(1) provides, in part:

"On motion and upon such terms as are just, the court may relieve a party * * * from a judgment for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under [ORCP] 64 F; [or] (c) fraud, misrepresentation, or other misconduct of an adverse party * * *."

[6] ORCP 1 A provides, in part, that "[t]hese rules govern procedure and practice in all circuit courts of this state, except * * * where a different procedure is specified by statute or rule."

Ordinarily, we determine the applicability or inapplicability of a rule of civil procedure in a particular context under ORCP 1 A as a matter of law. *See, e.g., State ex rel Upham*, 326 Or at 553-56 (concluding, as a matter of law, that, where ORS 419C.400 provided that a proceeding for determining whether a youth is in the jurisdiction of the juvenile court under ORS 419C.005 "shall be held * * * without a jury," the juvenile court erred in empaneling an advisory jury as provided in ORCP 51); *Gage v. Maass*, 306 Or 196, 201, 759 P2d 1049 (1988) ("if there were a conflict between" the ORCP and a statute governing the conduct of habeas corpus proceedings, under ORCP 1 A, the latter would prevail). Here, however, although the trial court concluded that ORCP 71 did not apply, it nevertheless was guided by criteria set out in that rule in determining whether the stipulated judgment should be set aside. Father has not identified any manner in which the trial court's conduct of the hearing or its decision on his motion to set aside the termination judgment would have differed had the court determined that ORCP 71 was applicable as a matter of law. In short, the trial court's error, if any, was harmless and does not require reversal. ORS 19.415(2). Father's first assignment of error fails.

In his third and fourth assignments of error, father asserts that SCF was involved in his decision to mediate the terms of his post-adoption relationship with the putative adoptive parents, including participating as a party in an "agreement to mediate"; that the resulting post-adoption agreement and the stipulated judgment terminating father's parental rights were executed at approximately the same time and concerned the same subject matter; and that SCF received a benefit from the execution of the post-adoption agreement between father and the putative adoptive parents, namely, his stipulation to termination of his parental rights. Therefore, father argues, the post-adoption agreement and the stipulated judgment of termination were "mutually binding"; SCF, in effect, breached the latter agreement when it removed child from the home of the putative adoptive parents; and SCF should be estopped from receiving the benefit of his stipulation to terminate his parental rights. Alternatively, father argues that the failure of the putative

adoption constituted a "condition subsequent" that extinguished his obligation under the stipulated judgment of termination. SCF responds that it was not a party to the post-adoption agreement between father and the putative adoptive parents and that the stipulated judgment of termination, to which it was a party, was not contingent upon the execution or performance of the post-adoption agreement. SCF also responds that it is not estopped from implementing the stipulated judgment, because father has not demonstrated the necessary elements of estoppel.

■ We first consider whether the stipulated judgment of termination was contingent or conditioned on successful execution of the post-adoption agreement. The interpretation of the various documents presents initially a question of law. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). We review any relevant factual determinations *de novo*. SCF was not a party to the post-adoption agreement. As to the stipulated judgment of termination, father does not point to, and we have not identified, anything in the text of the stipulated judgment that demonstrates that the parties or the court intended for that judgment to integrate the terms of, or otherwise be contingent or conditional on successful execution of, the post-adoption agreement. To the contrary, the stipulated judgment, consisting of slightly more than two pages of findings and conclusions by the court, does not even mention the putative adoptive parents or any agreement with them. The text of the stipulated judgment therefore does not disclose that the parties or the court intended such a contingency or condition.

■ As evidence that the judgment and the post-adoption agreement were interrelated, father points to an SCF Substitute Care Case Review report, dated October 1998 and disseminated to the court and the parties to the termination proceeding, in which SCF noted that "[a] plan is in place to formally mediate * * * visits as a part of accepting a stipulation of the termination of parental rights with the father," as well as case notes to similar effect. Father also points to the post-adoption agreement itself, which states in part that he "agrees to execute documents and take any actions required to relinquish his parental rights regarding

[child] and to support the adoption [by the putative adoptive parents]." Father asserts that SCF initiated and was "involved" with his mediation with the putative adoptive parents, because SCF generally refers parents to mediators, pays for the service, and identifies the goals of such mediations, and because, in this case, it required that father's post-adoption contact with child be supervised.[7] Father also asserts that SCF knew that he was "relying on" the post-adoption agreement. Finally, he asserts that SCF failed to apprise him that the agreements were mutually exclusive or that there was any risk that the adoption would fall through.

We conclude that, even considered alone, the evidence relied on by father is insufficient to demonstrate that the stipulated judgment was contingent or conditional on the post-adoption agreement. That conclusion is confirmed by weighing father's evidence against contravening evidence. In the hearing preceding entry of the stipulated judgment, counsel for SCF stated:

> "And the parties have reached an agreement to stipulate to certain allegations in the petition. And as a part of that agreement, the parties—*this is not conditioned, the stipulation is not conditioned on, or contingent on this agreement*, but the parties have entered into mediation. [Father] has mediated some visitation contact with the child." (Emphasis added.)

SCF's statement clearly indicated that the post-adoption agreement and the stipulated judgment were not mutually dependent. Neither father nor his counsel objected to that characterization of the stipulated judgment. Indeed, when the trial court explicitly asked father if he "understood the Attorney General's remarks," father responded that he did.

---

[7] In regard to SCF's involvement in the mediation between father and the putative adoptive parents, father also offered in the set-aside hearing, and directs this court's attention to, SCF's "Request for Proposals" for mediation services. That document stated that SCF's goal in cases referred for mediation is, in part, "to achieve voluntary relinquishment of parental rights." Father also offered in evidence a standard professional services contract form between SCF and mediators. It stated that the "goal of the service is [to] mediate an agreement between the birth parents, adoptive parents, and SCF" that will result in, among other things, voluntary relinquishment of parental rights. Because father did not testify at the set-aside hearing, and does not assert on appeal, that he was aware of those documents before stipulating to termination, we do not consider them.

██ Finally, and in any event, a premise of father's third assignment of error appears to be that the stipulated judgment constitutes part of a contractual arrangement that is enforceable for breach. That is not the case. A stipulated judgment has the same effect as a judgment that is entered after a trial on the merits of a claim. *Webber v. Olsen*, 330 Or 189, 196, 998 P2d 666 (2000). Some remedies that are available to challenge a judgment resemble remedies that are available to challenge a contract, such as fraud, mutual mistake, or absence of consent. However, a violation of a term of a judgment does not give rise to an action for breach of contract. *Id.* at 196-97.

For the above reasons, we conclude that father did not prove his claim for breach of the stipulated judgment of termination based on the premise that it was contingent or conditioned on successful execution of the post-adoption communication agreement. Accordingly, the trial court did not err in denying father's motion to set aside the judgment on the ground of SCF's asserted breach.

██ As to whether SCF nevertheless is estopped from receiving the benefit of the stipulated judgment, estoppel "requires proof of a false representation, (1) of which the other party was ignorant, (2) made with the knowledge of the facts, (3) made with the intention that it would induce action by the other party, and (4) that induced the other party to act upon it." *Keppinger v. Hanson Crushing, Inc.*, 161 Or App 424, 428, 983 P2d 1084 (1999). In order to establish estoppel against a state agency, a party must have relied on the agency's representations and the party's reliance must have been reasonable. *Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 126, 895 P2d 755 (1995). "[T]here can be no estoppel where the knowledge of both parties is equal and nothing is done by the one to mislead the other." *City of Salem v. Furlott*, 149 Or App 336, 341, 942 P2d 872, *rev den* 326 Or 68 (1997) (citation and internal quotations omitted).

Based on the evidence discussed above in connection with father's assertions concerning breach of contract, we conclude that father has not demonstrated that SCF should

be estopped here. In particular, nothing in this record demonstrates that any affirmative statement made by SCF regarding the mediated post-adoption agreement or the putative adoption was false. SCF never expressly told father that the stipulated judgment of termination was contingent on the post-adoption agreement or guaranteed to father in any way that the putative adoption would succeed. The record also does not show that SCF had superior knowledge, at the time that the judgment was entered, regarding the eventual failure of the putative adoption. To the contrary, SCF also believed that the adoption would occur. Finally, to the extent that father asserts that SCF failed expressly and affirmatively to apprise him of the noncontingent nature of the termination judgment, SCF's counsel's statements at the December 15, 1998, hearing demonstrate otherwise. Accordingly, father's estoppel argument also fails.

■ In his fifth assignment of error, father asserts that the trial court erred by failing to set aside the judgment either on the ground of misrepresentation or mutual mistake.[8] As to misrepresentation, father relies on the same general facts and circumstances surrounding the mediation of the post-adoption agreement and his stipulation to termination discussed above. As to mutual mistake, father asserts that he and SCF each mistakenly believed that "there would be [an] adoption by the [putative adoptive parents] into which the [post-adoption] agreement could be incorporated." SCF again responds that SCF did not represent to father that the termination judgment was contingent on the post-adoption agreement and that father and SCF were not mutually mistaken about any relevant fact at the time the stipulated judgment was entered.

■ Rescission of a contract on the basis of a misrepresentation or mutual mistake must be based on clear and convincing evidence. *Lesher v. Strid*, 165 Or App 34, 41, 996 P2d 988 (2000).

---

[8] Father bases this assignment of error, in part, on the criteria set out in ORCP 71 for obtaining relief from judgment. As discussed above in connection with father's first assignment of error, father has not identified any manner in which the trial court's decision would have differed had the court determined that ORCP 71 was applicable.

"An innocent misrepresentation of fact renders a contract voidable by a party if the party's manifestation of assent is induced by * * * a material misrepresentation by the other party upon which the recipient is justified in relying. A mutual mistake of fact renders a contract voidable by the adversely affected party, where the parties are mistaken as to the facts existing at the time of the contract, if the mistake is so fundamental that it frustrates the purpose of the contract, and where the adversely affected party does not bear the risk of the mistake. A mistake is a state of mind which is not in accord with the facts." *Id.* at 41-42 (ellipsis in original; citations, internal quotation marks omitted).

We conclude that there was neither a misrepresentation by SCF nor a mutual mistake by the parties. As to the former, as previously discussed, nothing in the record demonstrates that SCF represented to father that his stipulation to the judgment terminating his parental rights was contingent or conditioned on the successful execution of the post-adoption agreement. Moreover, again, even assuming that SCF made statements that may have been understood by father to constitute such a representation, father was no longer entitled to rely on that understanding after SCF stated in the termination hearing that the two agreements were not mutually dependent and father acknowledged that he understood that statement. *See Wagner v. McNeely*, 161 Or App 215, 219, 984 P2d 943 (1999) (rejecting the defendant's fraud and misrepresentation arguments without further discussion on the ground that they were defeated by his own express disclaimers as to the existence of any relevant representations).

As to mutual mistake, at the time of the stipulated judgment, both father and SCF believed that child would be adopted by the putative adoptive parents who were named in the post-adoption agreement. Indeed, as of December 15, 1998, SCF was continuing to act to facilitate that adoption. For those reasons, at the time of the stipulated judgment, there was no mistake of fact. The fact that the putative adoptive parents eventually were unable to adopt child was unanticipated and is not a basis for rescission. *See Meyer v. Kesterson*, 151 Or App 378, 393, 950 P2d 896 (1997), *rev den* 327 Or 123 (1998) ("The length of time and cost necessary for

defendant to satisfy his own obligation under the agreement to obtain access to the property, although unanticipated, is not a basis for rescission."). In short, because no cognizable mistake existed at the time of the judgment, the stipulated judgment cannot be set aside on that ground. *See also Murray and Murray*, 120 Or App 216, 219, 852 P2d 204 (1993). Father's fifth assignment of error fails.

In his final subconstitutional claim of error, father argues that the trial court erred in denying his motion to set aside the stipulated judgment because, according to father, the judgment violated Oregon's open adoption statute, ORS 109.305, and related regulations. Father argues that "[s]ince SCF revoked the adoptive placement with [the putative adoptive parents], the post adoption agreement is not with a proper party. Therefore, the agreement and resulting stipulated judgment are void as directly conflicting with the regulations and as against public policy." Particularly, father also argues that SCF violated OAR 413-120-0670(5), which requires "SCF staff to explain to both parties that post-adoption communication is 'based on trust and not enforceable unless it is reviewed by a judge and made part of the adoption decree per ORS 109.305.'" SCF responds that any defects in the post-adoption agreement are irrelevant to the validity of the stipulated judgment of termination, because there was no agreement between SCF and father that the stipulated judgment and the post-adoption agreement were mutually dependent. We agree with SCF. As we previously have determined, the stipulated judgment of termination was not contingent on the successful execution of the post-adoption agreement. Father's argument fails.

We turn to father's constitutional arguments. In his second and ninth assignments of error, father asserts that the trial court's denial of his moti n to set aside the termination judgment violated his righ s under the Due Process Clause of the Fourteenth Amend nent to the United States Constitution. In his tenth assig ment of error, he asserts that the trial court's denial of his aotion was not "fundamentally fair." SCF responds that, if regard to those assertions, father failed to articulate a "devr oped argument on appeal." We agree and therefore reject those arguments without discussion.

 In his sixth assignment of error, again relying on the Due Process Clause, father argues that the trial court erred in denying his motion to set aside the stipulated judgment because he did not knowingly, voluntarily, and intelligently waive his parental rights. SCF responds that the record of the December 15, 1998, hearing clearly demonstrates a valid waiver of father's rights. Father's stipulation to termination of his parental rights was, in effect, a waiver of the constitutional safeguards available under the Due Process Clause to a parent whose rights the state seeks to terminate. *See State ex rel Juv. Dept. v. Geist*, 310 Or 176, 186, 796 P2d 1193 (1990) (because the permanent termination of parental rights is one of the most drastic actions a state can take against one of its inhabitants, the finality of a termination proceeding must be achieved consistently with due process). We therefore review as a matter of law to determine whether father's stipulation was voluntarily, knowingly and intelligently made. *See State v. Meyrick*, 313 Or 125, 132, 831 P2d 666 (1992) (waiver of a constitutional right must be voluntary, knowing, and intelligent). A waiver is valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been a knowing and intelligent waiver of a constitutional right depends, in each case, on the particular circumstances surrounding that case. *See id.*

At the hearing in which father stipulated to termination, the following exchange occurred among father's counsel, the court, and father:

"[COUNSEL FOR FATHER]: We would stipulate to the entry of [an] order [terminating father's parental rights] * * * freeing the child for adoption.

"And my client and I have reviewed not just the pleading, but in fact we've been presented with the stipulation from [SCF] and we have reviewed that. My understanding is that we won't be signing this, we'll be doing a corrected one, and we're only entering a stipulation on the record here today.

"For the record, I will note that we have done all of this in spite of the fact that I have reviewed with [father] this Court itself made comments a year or two ago that the agency does not have perhaps the basis of terminating the

father even if the agency had a basis for termination of the mother's rights in this case. But the analysis was, No. 1, it's in the best interest of these children, and, No. 2, even if we succeeded in winning the case, the children would lose. Much like the famous case in the book of Judges with Solomon, the children would then result in being split in half even with a win for [father]. That's not in the children's best interest.

"For those basic reasons, not—and I'm doing this for the record for myself, your Honor, not because of the legal reasons dealing with clear and convincing evidence of the petition, [father] has decided that it's in the best interest of his child and her sibling * * * to allow this to occur. And for those reasons, he is prepared to stipulate.

"THE COURT: Thank you.

"[Father], have you understood your attorney's remarks?

"[FATHER]: Yes, I have.

"THE COURT: Have you also understood the Attorney General's remarks?[9]

"[FATHER]: Yes, I have.

"THE COURT: Do you in fact wish to freely and voluntarily enter into the stipulation that has been outlined by the attorneys?

"* * * * *

"[FATHER]: Yes.

"THE COURT: And I understand you've—Mr. VanKommer has been your attorney for quite some time now; is that correct?

"[FATHER]: Yes, sir.

"THE COURT: Have you been satisfied with his advice and help throughout these proceedings?

"[FATHER]: Yes, I have.

---

[9] Our review of the record indicates that the court was referring to SCF's counsel's remarks quoted above, regarding the noncontingent nature of father's stipulation to termination.

"THE COURT: Has he answered all your questions to your satisfaction?

"[FATHER]: Yes, sir.

"THE COURT: And you understand you have the right to a full-blown trial; you know that?

"[FATHER]: Right.

"THE COURT: And the State must prove the allegations in the petition by clear and convincing evidence to sustain a burden of proof, their burden of proof; you recognize that?

"[FATHER]: Yes.

"THE COURT: You have a right to call live witnesses; you understand that?

"[FATHER]: Right.

"THE COURT: And you have the right through your attorney to cross-examine any witnesses called by the State?

"[FATHER]: Yes, sir.

"THE COURT: And you also have the right to present evidence on your own behalf; you know that?

"[FATHER]: Yes, right.

"* * * * *

"THE COURT: You have the right to testify on your own behalf if you so desired?

"* * * * *

"[FATHER]: Yes, sir.

"THE COURT: The Court is satisfied that [father] is knowingly and voluntarily entering into the stipulation that has been placed on the record. I find that he does so after the advice of experienced, competent counsel with whom he says he's satisfied."

In summary, at the hearing, father's counsel stated that father was stipulating to termination because "it's in the best interest of [the] child." In addition, the court questioned father in detail as to his agreement with his counsel's statements and his knowledge of his rights regarding proof of the

allegations against him. Finally, father indicated that he understood SCF's stated position that the stipulation was not contingent on the post-adoption agreement. We conclude that father voluntarily, knowingly, and intelligently stipulated to termination of his parental rights.

In his eighth assignment of error, father argues that the court erred in denying his motion to set aside the stipulated judgment on the ground that he received ineffective assistance of counsel in the termination proceeding. Father asserts that the record reflects his termination counsel's "failure to advise and discuss with [father] the possibility of permanency or adoption falling through." Father also asserts that counsel's failure prejudiced him because, as he testified at the set-aside hearing, "but for" the guarantee of continued contact with child "in his back pocket," he would not have relinquished his rights.

The statutory right to counsel in a parental rights termination proceeding includes a right to "adequate" counsel. *Geist*, 310 Or at 185. In the context of a termination proceeding, the standard for adequacy of counsel is whether, with counsel's assistance, the proceeding was "fundamentally fair." *Id.* at 189-90. Fundamental fairness does not require counsel to propound any particular theory of the case, and tactical choices by counsel—even those that backfire—generally will not constitute inadequate assistance. *Id.* at 190 (citing and quoting *Krummacher v. Gierloff*, 290 Or 867, 873-76, 627 P2d 458 (1981)). As to nontactical choices,

"counsel's functions include informing the defendant, in a manner and to the extent appropriate to the circumstances and to the defendant's level of understanding, of the existence and consequences of nontactical choices which are the defendant's to make, so as to assure that the defendant makes such choices intelligently. This function of counsel is particularly important when a defendant is called upon to waive fundamental rights, as by a guilty plea or waiver of jury trial." *Krummacher*, 290 Or at 874-75.

The burden of proof in establishing that a termination proceeding was fundamentally unfair by reason of counsel's inadequate assistance is on the parent. To establish inadequate assistance of counsel in a parental rights termination

proceeding, it is not enough for the parent to show that his or her trial counsel was inadequate; rather, counsel's inadequacy must have prejudiced the parent's cause. Thus, on *de novo* review, the reviewing court will remand or reverse only where, with adequate counsel, the result would have been different. *Geist*, 310 Or at 191.

Here, in essence, father asserts that (1) his counsel failed expressly to inform him that the putative adoption was not guaranteed to occur, and (2) he was prejudiced thereby because, if counsel had alerted him to that possibility, he would not have stipulated to termination of his parental rights. We review the record to determine whether father met his burden in those regards. At the hearing on father's motion to set aside the judgment, father's termination counsel testified that, at the time of the termination hearing, he believed that the putative adoptive parents were "the permanent placement" for child and that he understood that a "realistic" time frame was that the adoption would be completed within 90 to 120 days after termination. Father's termination counsel also testified that he never discussed with father "what might happen if for some reason the adoption [fell] through"; that the reason he never discussed that possibility with father was that child had been with the putative adoptive parents for one and a half years and that they already had been "subjected * * * to all of the preplacement examinations"; and that, based on his experience of advising clients regarding adoptions over a 15-year period—in which only two out of approximately 150 planned adoptions were not completed—he believed that completion of the adoption by the putative adoptive parents was "a fairly short and easy thing" and it "never occurred to" him that the adoption would not be completed. Counsel testified that, as of the time of the stipulated termination hearing, he had no reason to believe that SCF was not planning to go forward with the adoption.

Father also testified at the hearing on his motion to set aside the judgment. He testified that, before termination, he understood that the putative adoptive parents were to be the permanent placement for child; that he felt that child's home with the putative adoptive parents was "a safe, good home" and that child "seemed happy"; that, at the time of the hearing, he had "no doubt" as to that placement for child; that

"the agency, the mediator, everybody involved * * * gave me the complete reassurance that [the putative adoptive parents] were the adoptive—guaranteed adoptive parents for [child]"; and that it never occurred to him that the putative adoption might not occur. When asked whether he would have been concerned to hear SCF's counsel state in the termination hearing that the stipulated termination was not "conditioned on or contingent on" the post-adoption agreement, father testified that he did not know "the definitions of that stuff. That's why I have an attorney." He further testified that he did not ask about the issue because "I felt that if it was an important issue, he would have, you know, talked to me right then about it." Father also stated, however, that "nothing's guaranteed unless it's in writing" and that he "was very satisfied with" his counsel. Finally, as pertinent here, father testified that he "would have never signed off [his] rights without the mediation agreement."

Based on the above testimony, we conclude that counsel in father's termination proceeding was inadequate by reason of failing to inform and advise father of a significant potential consequence of his unqualified stipulation to termination, namely, the consequence that, if the putative adoption failed, father would be deprived of the benefit—continued contact with child—of the post-adoption agreement. The question nevertheless remains whether father was prejudiced, that is, whether providing that information and advice to father likely would have changed his decision to stipulate to termination. Again considering the quoted testimony, as well as the record of the termination hearing itself, we conclude not. In particular, counsel testified at the set-aside hearing that he believed that the putative adoption was all but certain to occur. Based on his experience, that expectation was reasonable. There was no evidence that he would have told father differently if he had advised him of a risk that the expected adoption would not occur. Further, there is no credible evidence that father would have decided not to stipulate to termination if he had been told that such a low risk of failure existed. The testimony in both the set-aside hearing and the stipulated termination hearing demonstrates that father stipulated in part because he believed that termination was in child's best interest; father believed that

the putative adoptive parents would provide a "safe, good home" for child and, where mother's rights were also being terminated, he understood that child would be eligible for permanent placement in that home only if his rights were terminated. Accordingly, we believe that, even if counsel had informed and advised father of the possibility that the putative adoption might fail and that, if it did, the post-adoption agreement would be without effect, it is unlikely that father would have declined to stipulate to termination.

We emphasize that we are not called on to determine whether father would have declined to stipulate to termination if he had been unable to mediate the post-adoption agreement with the putative adoptive parents. Thus, father's testimony on that point at the set-aside hearing, quoted above, is immaterial. Nor need we consider what father would have done had he *known* that the adoption would fail or if counsel had informed him that it was *likely* to fail. Rather, we consider only whether, on this record, father would have declined to stipulate to termination if his termination counsel had informed and advised him—consistent with termination counsel's testimony at the set-aside hearing, quoted above—concerning what was, in counsel's experience, the relatively small possibility that the adoption might fail. We conclude that, although it would have been appropriate for counsel to have informed and advised father in that regard, it is unlikely that counsel's doing so would have caused father to decline to stipulate to termination. Because father has not met his burden to show that he was prejudiced by counsel's representation, he cannot prevail on his ineffective assistance of counsel claim.

■ We turn, finally, to father's ninth assignment of error. In that assignment, in addition to the due process claim previously mentioned, father asserts that his rights under the Equal Protection Clause were violated because he has been treated differently from a parent who seeks to revoke a consent to adoption before the adoption is final. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.*, 473 US 432,

439, 105 S Ct 3249, 87 L Ed 2d 313 (1985) (internal quotations and citation omitted). Father's argument rests on the assumption that a parent who consents to an adoption under ORS 109.312 is similarly situated to a parent who stipulates to the termination of parental rights under ORS 419B.500-.530. SCF responds that father's rights under the Equal Protection Clause were not violated, because there are meaningful differences between the circumstances of parents who revoke relinquishments in private adoptions and those of father. We agree with the state. Father is not similarly situated to a parent who consents to, then revokes his consent to, an adoption. Therefore, his equal protection argument fails. *Id.*

For all of the above reasons, the trial court did not err in denying father's motion to set aside the stipulated judgment terminating his parental rights to child.

Affirmed.