No. 333 April 16, 2025 695

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of H. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. S.,
*Appellant.*

Wasco County Circuit Court
22JU04703; A183248

John A. Wolf, Judge.

Argued and submitted February 3, 2025.

Tiffany Keast, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Lagesen, Chief Judge, and Hellman, Judge.*

ORTEGA, P. J.

Affirmed.

_____
 * Lagesen, Chief Judge *vice* Mooney, Senior Judge.

## ORTEGA, P. J.

In this juvenile dependency case, mother appeals from the judgment asserting jurisdiction over her child, H.[1] In her first assignment of error, mother contends that the juvenile court abused its discretion in allowing her third court-appointed counsel, Farnworth, to withdraw. In her second and third assignments, mother contends that she did not validly waive her right to counsel and that the juvenile court erred in proceeding to trial on the jurisdictional allegations and asserting jurisdiction over H in the absence of a valid waiver. We conclude that mother validly waived her right to counsel because the totality of the circumstances shows that she intentionally relinquished a known right. We further conclude that any error in allowing counsel Farnworth to withdraw was harmless on this record. The juvenile court therefore did not err in proceeding to trial on the jurisdictional allegations or in asserting jurisdiction over H. We affirm.

## I. FACTS

The relevant and undisputed facts are procedural. DHS removed H from mother's care in early October 2022. On October 6, DHS filed a dependency petition alleging four conditions warranting jurisdiction concerning mother's substance abuse, mental health, exposure of H to unsafe individuals, and H's unexplained positive test for amphetamine and methamphetamine. Mother appeared at a shelter hearing with counsel Hinman the same day. As it did repeatedly during the pendency of this case, the court warned parents of the consequences of failing to appear: DHS would request a default judgment making H a ward of the court, and the court would then determine where she would be placed and what parents would need to do for her to return to their custody and care. Mother also appeared with Hinman on October 20 and 27 but was not prepared to admit or deny the allegations in the petition.

Mother again appeared with Hinman on January 9, 2023, and reported that she was ready to proceed at the first trial setting on January 17. On January 13, Hinman filed a

___
[1] Father is not a party to this appeal.

motion to withdraw as mother's counsel, due to "irreparable breakdown in the attorney client relationship that will not allow further representation," and the juvenile court granted the motion the same day. Mother appeared for trial on January 17, and when the court explained that it had been attempting to find new counsel for mother but had not yet been successful, mother confirmed that she still wished to be represented by counsel in this case.

The next day, the court appointed counsel Gouge to represent mother. On January 23, mother appeared with Gouge, and the court reset the jurisdictional trial for March 14. Mother again appeared with Gouge on March 6, and Gouge addressed an email mother had personally sent to the court and the parties regarding visitation.

On March 14, mother appeared with Gouge for the second trial setting. After DHS and father presented their opening statements, Gouge stated that mother's "goal is to convince the Court that the allegations that have—of abuse or neglect or mental health issues on the part of [mother] or the substance abuse issues are that they're false, and it is her goal that at the end of this that the Court will not grant wardship in custody to the State." DHS proceeded to call mother as its first witness. About an hour into mother's direct examination—during which mother admitted that she last used methamphetamine two days after the shelter hearing, that in February 2023 she had been diagnosed with severe methamphetamine addiction and recommended for inpatient treatment, and that some of the random mouth swabs and urine samples she had given to DHS had come back positive—mother interjected to directly ask the court for new counsel:

"[MOTHER:]   Could I say something? Sorry.

"THE COURT:  You need—just need to respond to the questions. If there's something else that needs to be addressed, your attorney can ask the questions.

"[MOTHER:]   Well, what if I need to get a different attorney? How do I go about that?

"THE COURT:  At this point, that would be pretty challenging.

"[MOTHER:]   Mm-hmm. Well, I don't feel that she's representing me very well because we haven't even talked about any of—anything going on."

The court took a short recess to allow mother and Gouge to confer, after which Gouge confirmed that she and mother had not repaired the attorney-client relationship. The court then addressed mother directly:

"THE COURT:   So [mother], if that's the direction we head, it leaves me with a few options, frankly, none of which are great. If I do allow Ms. Gouge to withdraw based on the breakdown of your relationship, we could either continue to go forward without an attorney representing you, which I certainly don't recommend, and I gather from your head shake, you don't want. Which is probably the smart call.

"The other option will be to continue our hearing until we get someone on board for you. And I can tell you that that will be a bit of a challenge, because we've got a variety of folks involved in this case that wipes out a lot of attorneys. Ms. Gouge is your second attorney on this case, so it may take us some time to get someone. I'm confident we can. It's a matter of timing, which of course drags this out.

"If you think it makes any sense, I'm willing to take a longer recess and let you and Ms. Gouge chat, see if you can work out whatever the issue is. If you can't, I should note that at some point I will run out of attorneys that I can get for you. In which case then you would need to go forward without one, which again, not recommended, not a good idea. There's a reason we appoint folks attorneys, particularly on cases that involve such important things as the ability to parent your children. Seems like you get that part of it.

"Want to take some additional time and chat with Ms. Gouge?

"[MOTHER]:   No, she hasn't been like, listening at all, and I can't get hold of her at all, and everything I bring up to her, she just tells me to do whatever they say. Like, she's representing—

"THE COURT:   Okay.

"[MOTHER]:   —them, not me.

"THE COURT    And I guess I'd touch on that a little bit. You know, Ms. Gouge's job is not necessarily to just do whatever you want without proving some—

"[MOTHER]:    I know, but it's too—

"THE COURT:    With—without providing some push-back and provide you some advice on what she thinks is perhaps in your best interest. Ultimately, you are driving that bus and get to make those decisions, but just because she's not agreeing with you on everything is not the same as not representing you. Does that make sense?

"[MOTHER]:    Yes."

After father objected to a continuance given that, in his view, "the case is dragging on due to [mother's] inability to work with her counsel," mother acknowledged that this case is "huge" and that she wanted it to "be done soon," but that she "need[s] to be represented by someone who's going to represent [her]." The court reassured mother that it was taking her concern seriously and ultimately allowed Gouge to withdraw.

Mother next appeared on March 30 without counsel. The court explained that efforts to find mother new counsel had not been successful because "[w]e've exhausted all the local options" and that it had been "harassing" the Office of Public Defense Services to find someone but that it did not know how long it would take.

On April 3, the court appointed counsel Farnworth to represent mother, and they appeared together on April 10. Farnworth noted that mother had been "incredibly responsive" and that they had met at her Salem office. Mother appeared with Farnworth at the third trial setting on July 11, but the court was forced to reset trial again to August 24 because H's attorney had recently discovered a conflict requiring him to withdraw.

On July 24, Farnworth filed a motion to withdraw due to what counsel believed to be a "mandatory withdrawal under the Oregon Rules of Professional Conduct." In her supporting declaration, Farnworth stated, "I must request to

withdraw as attorney for my client under ORCP 1.16(a)(1)."[2] The juvenile court granted Farnworth's motion the next day without a hearing and ordered that "another attorney shall be appointed."

Mother appeared without counsel at the fourth trial setting on August 24 and asked the court to allow the trial to proceed in September "even if I don't have an attorney." The court responded by advising mother that she would be at a disadvantage without counsel:

"THE COURT:　You understand that at that hearing, obviously the agency is going to be represented by an attorney, as are the other parties.

"* * * * *

"But I just want to make sure that you understand: All these folks are going to be represented by an attorney at that trial. If you proceed without one, you're still subject to all the various rules that apply, whether those are the Oregon Revised Statutes that dictate how we need to proceed in the case; or the Rules of Evidence; or the rules of court procedure are going to apply even if you don't have an attorney.

"You can't rely on the other attorneys or the Court or court to provide you any legal advice. We're not able to do that.

"So if you proceeded without an attorney, you really are at a disadvantage. And as I said, we're doing—everything we can to try and get you one on board."

_____

[2]　RPC 1.16 provides, in relevant part:

"(a) A lawyer shall reasonably inquire into and assess the facts and circumstances of each representation to determine whether the lawyer may accept or continue the representation. Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

"(1) the representation will result in violation of the Rules of Professional Conduct or other law[.]

"* * * * *

"(c) A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."

After DHS objected to a September trial setting as too soon, even assuming mother found new counsel immediately, the court set a fifth trial setting for November 28.

Mother appeared on November 6 without counsel. The court noted that "[w]e still don't have counsel for [mother]," to which mother responded, "Your Honor, I plan to file papers for that to be my own counsel." Mother explained that she had "all the paperwork almost done" and was planning on "turning [it] in before 5:00 today." The court then engaged mother in the following colloquy:

"THE COURT:  You certainly have the right to represent yourself if you want to do that. You also have the right to an attorney. Unfortunately, I haven't been able to find you one since you've gone through several.

"But you do need to understand that if you're representing yourself, obviously—well, maybe not obviously, but you don't have the same legal training and experience that the attorneys that are involved in the case do and who are representing other parties including the State, which is seeking to have wardship granted over [H].

"I assume you know all the things an attorney can do for you: Help you prepare for the case. Help you subpoena witnesses, work through the discovery process, identify any potential flaws in the State's case. Ensure that all the other parties follow the rules of evidence. Assist you in following the rules of evidence, making sure that all of your evidence can get appropriately before the Court, assuming it is appropriate to get before the Court, and make sure that the other parties don't get evidence that's not appropriate to come before the Court before the Court.

"They can assist you in evaluating whether or not an agreement should be reached with the State, and if so, what that agreement looks like. They can assist you in evaluating what a potential—what the potential outcomes of the case would mean to you, whether that's the Court finds [H] within the Court's jurisdiction or doesn't.

"They can help you evaluate the potential disposition of the case if it turns out that [H] is within the jurisdiction of the Court; meaning what services you would need to take—what services you'd need to participate in in order to get her back in your care and custody, and whether or not

the services that the State is requesting are appropriate. You understand all of that?

"[MOTHER]:   (No audible response)

"THE COURT:   Can you kind of briefly explain to me in your own terms what an attorney might be able to do for you in this case?

"[MOTHER]:   So far, an attorney has not helped me too much in the case, I feel. I have asked them to turn in discovery many times. They never did. And even the witness list that I gave them, they never be—put them all down. Just the whole time, they weren't really very helpful, and I want to get this going because I want her home, and I feel this is the fastest way to get her home.

"THE COURT:   So it sounds like part of your decision is based on the fact that you've been unsatisfied with the attorneys that you've had to date, is that a fair statement?

"[MOTHER]:   Yeah.

"THE COURT:   And you're prepared to go forward without counsel?

"[MOTHER]:   I am.

"THE COURT:   You understand that's a significant decision and the impacts are potentially significant as well?

"[MOTHER]:   I do. I understand, Your Honor."

The parties proceeded to trial on November 28 after which the juvenile court ruled that H was within its dependency jurisdiction based on mother's substance abuse and exposing H to unsafe individuals, and on the fact that H had tested positive for methamphetamine and amphetamine in August 2022. Mother appeals from the resulting judgment of jurisdiction and disposition making H a ward of the court.

## II.   ANALYSIS

The right to counsel in juvenile dependency proceedings is derived from the Due Process Clause of the Fourteenth Amendment. *Dept. of Human Services v. E. L. P.*, 336 Or App 751, 760, 562 P3d 303 (2024) (citing *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 188 n 13, 796 P2d 1193 (1990)

("Any federal constitutional right mother might have to appointed counsel in a termination case would be derived from the Due Process Clause of the Fourteenth Amendment, not from the Sixth Amendment. *** The right to counsel under *** the Oregon Constitution is available only in criminal prosecutions.")). ORS 419B.205[3] governs the right to counsel in dependency proceedings other than termination of parental rights. Under that statute, "unlike in termination proceedings, a juvenile court retains authority to deny a parent's request for counsel in dependency proceedings *** if the nature of the proceeding and due process do not require representation." *Dept. of Human Services v. T. L.*, 358 Or 679, 688, 369 P3d 1159 (2016). However, in this case the parties agree that mother had a right to court-appointed counsel at the jurisdictional trial. We therefore assume that she did.

The parties further agree that a waiver of the right to counsel in juvenile dependency proceedings must be knowing and intentional. Although we noted in *E. L. P.* that the origin, scope, and extent of the right to counsel in juvenile dependency cases "is substantially different from the right to counsel in a criminal proceeding," 336 Or App at 761, we agree that the same legal standard applies to the waiver of counsel under the Sixth and the Fourteenth Amendments. *State v. Meyrick*, 313 Or 125, 137, 831 P3d 666 (1992) ("A waiver of the Sixth Amendment right to counsel

---

[3] ORS 419B.205 provides:

"(1) Counsel shall be appointed for the parent or legal guardian whenever the nature of the proceedings and due process so require, and when the parent or legal guardian has been determined by the court to be eligible to receive appointed counsel under the standard in ORS 135.050 or the policies, procedures, standards and guidelines adopted under ORS 151.216. In deciding whether to appoint counsel under this section, the court shall consider the following factors:

"(a) The duration and degree of invasiveness of the interference with the parent-child relationship that possibly could result from the proceeding;

"(b) The complexity of the issues and evidence;

"(c) The nature of allegations and evidence contested by the parent or legal guardian; and

"(d) The effect the facts found or the disposition in the proceeding may have on later proceedings or events, including but not limited to termination of parental rights or criminal proceedings.

"(2) The court may not substitute one appointed counsel for another except pursuant to the policies, procedures, standards and guidelines adopted under ORS 151.216."

must be voluntary, knowing, and intelligent, as must any waiver of constitutional rights.").[4]

As noted, on appeal mother challenges the juvenile court's rulings allowing counsel Farnworth to withdraw and accepting mother's waiver of counsel. We address her second assignment of error first and conclude that mother validly waived her right to counsel at the jurisdictional trial. We further conclude that any error in granting Farnworth's motion to withdraw was harmless on this record.

A.   *Waiver of Counsel*

"A waiver is valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege." *Meyrick*, 313 Or at 137. The "known right" component of a waiver "refers to a [parent's] knowledge and understanding of the right to counsel" and of "the dangers and disadvantages of self-representation." *Id.* at 132 n 8. The "intentional" component "refers to a [parent's] 'intent' to waive the right" and encompasses "the requirements that the choice must be 'voluntary'" and not the result of coercion. *Id.*

"Whether there has been an intentional relinquishment or abandonment of a known right or privilege will depend on the particular circumstances of each case, including the [parent's] age, education, experience, and mental capacity; the charge (whether complicated or simple); the possible defenses available; and other relevant factors." *Id.* at 132. In making that assessment, a juvenile "court should focus on what the [parent] knows and understands." *Id.* (emphasis omitted). "A colloquy on the record between the court and the [parent] wherein the court, in some fashion, explains the risks of self-representation is the preferred

---

[4] That is consistent with how courts assess the validity of a waiver of other rights derived from due process. *See State ex rel Dept. of Human Services v. Sumpter*, 201 Or App 79, 86, 116 P3d 942 (2005) (waiver of right to trial in termination of parental rights proceeding is valid "only when it reflects an intentional relinquishment or abandonment of a known right or privilege" (quoting *State ex rel SOSCF v. Dennis*, 173 Or App 604, 615, 25 P3d 341, *rev den*, 332 Or 558 (2001))); *State v. J. S. W.*, 295 Or App 420, 426, 434 P3d 481 (2018), *rev den*, 364 Or 849 (2019) (waiver of right to counsel in juvenile delinquency proceeding is valid if the youth "has made an 'intentional relinquishment or abandonment of a fully known right'" (quoting *In re Gault*, 387 US 1, 42, 87 S Ct 1428, 18 L Ed 2d 527 (1967))).

means of assuring that the [parent] understand[s] the risks of self-representation." *Id.* at 133. Indeed, the more relevant information the court provides about the right to counsel and the risks of self-representation, the more likely that the waiver will be valid and the record will so reflect. *Id.*

Applying those principles here, we first conclude that mother's waiver was knowing, that is, that she understood her right to counsel and the risks of self-representation. First, the court repeatedly informed mother of the gravity of the proceeding—that it involved "the ability to parent your children"—and the potential consequences of a jurisdictional trial—that H could become a ward of the court, and the court would then determine where she would be placed and what mother would need to do for her to return to her custody. Mother acknowledged that the case was "huge" and, initially, repeatedly asked for counsel to assist her. *Cf. State v. Reynolds*, 224 Or App 411, 418-19, 198 P3d 432 (2008), *rev den*, 346 Or 158 (2009) (the record supported a finding that the defendant understood the risks of self-representation when he was informed of the charges and the maximum penalties and initially stated that he wanted an attorney to help him). Later, when the court asked if she understood that choosing to represent herself was a "significant decision" and that "the impacts are potentially significant as well," mother responded, "I do. I understand."

Second, mother "was told by the court, and had experienced firsthand, some of the basic things an attorney could do" for her, which supports a finding that she was "aware of at least some services that an attorney would provide on [her] behalf." *Id.* at 419. The court explained to mother that an attorney could help her prepare for the case, subpoena witnesses, work through discovery, identify potential flaws in DHS's case, ensure that the other parties followed the rules of evidence, help her get evidence admitted under the rules of evidence, provide settlement negotiations and advice, and evaluate the potential outcomes of the case, including the potential disposition in the event the court asserted jurisdiction over H and, specifically, what services mother would need to participate in to have H returned to her care. In addition, mother was represented by three

attorneys—one who advocated for mother's defense theory at trial before mother made clear she no longer wanted to be represented by her, and another who described mother as "incredibly responsive" and advocated for increased visits in the community.

Third, mother "was specifically told that [she] would be at a disadvantage if [she] chose to represent [her]self." *Id.* The court explained to mother that DHS, father, and H would be represented by counsel at trial and that, if she proceeded without an attorney, she would still be "subject to all the various rules that apply," including the Oregon Revised Statutes and the rules of evidence and procedure, and that she could not rely on the other attorneys or the court for legal advice. Later, the court explained to mother that she did not have the same legal training and experience that the attorneys representing the other parties have, particularly counsel for DHS.

In urging a different result, mother first argues that "the record does not reflect that mother actually *understood* the court's statements." Mother points out that, after explaining the risks of self-representation, the court asked mother if she understood everything, and the transcript reflects that mother's response was not audible. Mother further argues that, when the court asked her to explain in her own terms what an attorney might be able to do for her in this case, mother responded that her court-appointed attorneys had not helped her. Relying on *State v. Todd*, 264 Or App 370, 332 P3d 887, *rev den*, 356 Or 401 (2014), mother argues that her "response that her previous attorneys had not assisted her reflected that she did *not* understand what safeguards she would be waiving by proceeding *pro se*, much less that waiving counsel posed serious risks."

We are not persuaded. Mother's lack of an audible response confirming her understanding of the court's explanation does little to undermine the totality of the record that reflects that mother was well aware—through her own experience and the court's repeated colloquies—of the services that an attorney could provide on her behalf. And we disagree that her expressed dissatisfaction with her previous attorneys reflects a lack of understanding of the benefits

of counsel or the risks of self-representation. *See State v. Brown*, 141 Or App 156, 162, 917 P2d 527, *rev den*, 323 Or 691 (1996) (the record as a whole showed that the defendant knew of his right to counsel and intentionally relinquished that right because, after consulting with several attorneys, "he believed that no attorney with whom he had talked would work in his 'best interests'" and therefore chose to represent himself). Moreover, mother's reliance on *Todd* is misplaced because, in that case, the court did not speak to the defendant about the risks of self-representation, but rather focused on whether the defendant wanted to be represented by counsel or proceed *pro se*. 264 Or App at 380. Here, the juvenile court engaged mother in detailed colloquies at more than one hearing about the benefits of counsel and the risks of self-representation.

Finally, we conclude that mother's waiver was intentional, that is, that she intended to waive her right to counsel and made the choice voluntarily and not as a result of coercion. It was mother who proposed that she represent herself, and she explained that she had already begun preparing paperwork to file "to be my own counsel."[5] And after the court warned her of the risk of proceeding without counsel, mother said that she was prepared to go forward.

Mother contends that her decision was involuntary (and therefore not intentional) because, in her view, "the court in this case put mother in an impossible position: she could either waive her right to counsel and proceed to trial *pro se* to attempt to secure her child's return to her, or she could wait, indefinitely and while her child remained in stranger foster care, until the court found an attorney to represent her for trial." We disagree. In our view, the court did its best to address mother's stated concerns about counsel and to accommodate mother's desire for counsel that would "represent [her]" while repeatedly warning mother

---

[5] Mother later filed an "Affidavit Opportunity to Cure" in which she stated:

"3) I hereby put all People and persons on legal and lawful NOTICE that I hereby void and terminate all past and present powers of attorney.

"*****

"9) [J. S.] is the Administrator and Beneficiary as well as holder in due course of the vessel [J. S.], (a Oregon corporation [*sic*]) and is not an attorney and not represented by an attorney."

that it could not guarantee a timeframe in which new counsel would be available for appointment and that "at some point" it would "run out of attorneys." For example, when mother insisted that the court allow Gouge to withdraw, the court cautioned her that finding her new counsel would "be a bit of a challenge, because we've got a variety of folks involved in this case that wipes out a lot of attorneys" and that because Gouge was her second attorney on this case, "it may take us some time to get someone * * * which of course drags this out." Mother may have faced a difficult choice, but we are unpersuaded that her decision was involuntary.

In sum, we conclude that the record supports a finding that mother's waiver of counsel was made knowingly and intentionally. We therefore reject mother's second assignment of error.

## B. *Farnworth's Withdrawal as Court-Appointed Counsel*

In her first assignment of error, mother contends that the juvenile court abused its discretion in allowing Farnworth to withdraw as mother's court-appointed counsel. We conclude that any error is harmless on this record.

An error is harmless if there is "little likelihood" that it affected the outcome. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). As noted, ORS 419B.205 allows the juvenile court to deny a parent's request for counsel in dependency proceedings "if the nature of the proceeding and due process do not require representation." *T. L.*, 358 Or at 688. Here, again assuming without deciding that this is a case in which ORS 419B.205 required the appointment of counsel for mother, any error in permitting Farnworth to withdraw had little likelihood of affecting the outcome of the proceeding. Our review of the record confirms that nothing happened between Farnworth's withdrawal and mother's valid waiver of counsel for which the presence of counsel could have made a difference. Mother was not forced to litigate any motions without the assistance of counsel. *See, e.g.*, *State v. Kyei*, 337 Or App 473, 480, 563 P3d 978 (2025) (requiring a defendant to present pretrial motions *pro se* in the absence of a valid waiver of counsel was not harmless because we could not determine whether the development

and the disposition of his motions could have been affected if he had been represented by counsel). And she did not make damaging admissions of the sort that counsel can forestall or otherwise make critical decisions on which the presence of counsel could have had an effect. ORS 419B.205(1)(d). We therefore conclude that any error in allowing Farnworth to withdraw was harmless on this record, and we reject mother's first assignment of error on that basis.

Given our disposition of mother's first and second assignments of error, we necessarily reject mother's third assignment.

Affirmed.