Argued and submitted January 6, decision of the Court of Appeals affirmed on different grounds and judgment of the circuit court affirmed May 18, petition for reconsideration denied July 5, 1995

STATE OF OREGON,
by and through its
DEPARTMENT OF TRANSPORTATION,
*Respondent on Review,*

*v.*

HEWETT PROFESSIONAL GROUP,
a joint venture comprised of
John B. Brams, Thomas S. Miller, M.D.,
Corinne D. Miller, and Peter Lyon, M.D.,
*Petitioner on Review,*

*and*

CAPITAL CONSULTANTS, INC.,
an Oregon corporation,
*Defendant.*

(CC 9108-05286; CA A77301; SC S41575)

895 P2d 755

119-a

James N. Westwood, of Miller, Nash, Wiener, Hager & Carlsen, Portland, argued the cause for petitioner on review. With him on the petition and brief was Dennis P. Rawlinson.

Jas. Adams, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Dorothy S. Cofield, Tigard, filed briefs on behalf of *amicus curiae* Oregonians In Action.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

GRABER, J.

** Unis, J., did not participate in this decision.

**GRABER, J.**

In this condemnation action, defendant appealed from the judgment of the circuit court. Defendant argued that it was improperly precluded from pursuing at trial its affirmative defenses and counterclaims that addressed issues of valuation. The Court of Appeals affirmed, concluding that any error was harmless. *Dept. of Transportation v. Hewett Professional Group*, 128 Or App 480, 483, 876 P2d 844 (1994). We affirm the decision of the Court of Appeals, but on different grounds.

## PROCEDURAL BACKGROUND

The Oregon Department of Transportation (ODOT) initiated a proceeding in the circuit court to condemn property owned by defendant, Hewett Professional Group, for use in the Westside Corridor Project — a light rail transportation system that was being developed as an alternative to automobile traffic between Washington and Multnomah counties. The condemned property is located near the Sylvan Interchange on Highway 26 in Portland.

According to defendant, ODOT misrepresented to defendant that it would not take the property, or that part of the property containing a then-existing structure called the Sylvan Building. At the time ODOT made such alleged representations to defendant, defendant was in the process of planning, and applying for permission from Multnomah County, to demolish the Sylvan Building and to construct a new office facility on the property. By the time that ODOT notified defendant of its intent to take the property, defendant had demolished the Sylvan Building and had started, but not completed, construction of the new facility.

In the trial court, defendant asserted that ODOT planned to take the property before the Sylvan Building was demolished, but that ODOT concealed that intention until after the building was demolished. Defendant argued that ODOT effectively minimized the compensable value of the property, by luring defendant into razing the existing structure and leaving only the bare ground and a partially constructed new building at the time of the taking. Defendant argued that ODOT's aim was to eliminate the value of the Sylvan Building from the amount of just compensation that it

must pay for the taking. In pursuit of this theory, defendant pleaded affirmative defenses of equitable estoppel and "timing manipulation" in violation of ORS 281.060 and other statutes, and filed counterclaims for misrepresentation, "inverse condemnation," and "condemnation blight."

The trial court granted ODOT's motion for partial summary judgment as to those defenses and counterclaims. On ODOT's motion, the trial court also struck defendant's allegations concerning the value of the Sylvan Building. Nonetheless, at trial, the court allowed defendant to introduce evidence about the course of dealings between it and ODOT and about the value of the Sylvan Building before it was demolished. The trial court allowed the jury to consider whether to award compensation for the value of the Sylvan Building, under the following instruction:

> "If you find that the fair market value of the bare land after removal of the Sylvan Building includes the value of the Sylvan Building and the costs associated with its removal, you should include these amounts in your conclusion of just compensation. To do otherwise would be a manifest injustice to defendants. * * * On the other hand, if you find that the fair market value of the bare land after removal of the Sylvan Building does not include the value of the Sylvan Building and the costs associated with its removal, you should not include these amounts in your conclusion of just compensation. To do otherwise would be a manifest injustice to the State of Oregon."

The jury fixed defendant's compensation at $562,000, which was ODOT's estimate of just compensation for the property.

Defendant appealed. On appeal, defendant argued that the trial court erred when it granted summary judgment on the above-listed affirmative defenses and counterclaims and when it struck the allegations concerning the Sylvan Building's value. ODOT argued that, because defendant was able to present all its evidence about the value of the Sylvan Building and ODOT's alleged misconduct, and because the jury was allowed to take into account the value and removal costs associated with the Sylvan Building, the trial court's rulings subtracted nothing of substance from defendant's case. The Court of Appeals agreed with that argument and

affirmed the judgment. 128 Or App at 483. On defendant's petition, we allowed review.[1]

## HARMLESS ERROR

As noted, the Court of Appeals relied on the doctrine of "harmless error" to resolve the issues relating to summary judgment on the counterclaims and defenses. That court explained:

> "The defenses and counterclaims that defendant asserted are *not* the 'frame' of a case *for just compensation*; indeed, the theories in defendant's defenses and counterclaims have no factual or legal bearing on the value of the building and the removal costs independent of the condemnation claim itself. The error, if any, in granting the partial summary judgments, was harmless. So too was the striking of the allegations of value, in view of the fact that defendant was permitted to produce evidence of and argument concerning value at trial. We reject the five assignments that challenge the partial summary judgments and the striking of the allegations." 128 Or App at 483 (emphasis in original).

■ That discussion misses the point. Although defendant was able to present its evidence of ODOT"s alleged acts of deception and of the value of the Sylvan Building, being able to present that evidence is not the same as being able to attach that evidence to a legal theory. The jury was instructed: "i[f] you find that the fair market value of the bare land after removal of the Sylvan Building includes the value of the Sylvan Building and the costs associated with its removal, you should include these amounts in your conclusion of just compensation." The jury was not instructed, however, about *why* and *under what circumstances* it "should include" the value of the building and its removal costs. If even one of defendant's affirmative defenses or counterclaims was a permissible legal theory, in view of the evidence, then defendant was denied the opportunity to obtain a jury instruction that would have framed the matters of law relevant to its theory of the case.

---

[1] Defendant did not petition for review with respect to the striking of the allegations concerning the value of the Sylvan Building. Accordingly, we do not consider that issue.

For the foregoing reasons, we disagree with the Court of Appeals that any error was harmless. We therefore turn our attention to the claimed errors.

## DEFENDANT'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS[2]

### A. *Factual Background*

■ The issues pertinent to our review were decided on summary judgment. Because we are reviewing the trial court's ruling on a motion for summary judgment, we view the evidence and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Fields v. Jantec*, 317 Or 432, 437, 857 P2d 95 (1993). The following facts were established without contradiction in the record.

On February 22, 1991, the governor signed into law Senate Bill 573. Or Laws 1991, ch 3. SB 573 addressed the development of the Westside Corridor Project. SB 573, which was effective upon its passage, was enacted by the legislature to expedite the development of the project, so that the project would qualify for federal funding. Or Laws 1991, ch 3, preamble. That statute consolidated final authority for determining the location of the light rail line, and necessary corresponding highway improvements, in the Tri-County Metropolitan Transportation District (Tri-Met). Or Laws 1991, ch 3, preamble & § 6.[3]

At all material times, defendant owned the Sylvan Building, which was located on the property later condemned in this action. Late in 1990, defendant made plans to develop

---

[2] ODOT argues that ORS 35.295 does not authorize defendant to assert its affirmative defenses and counterclaims. Because we hold that defendant's affirmative defenses and counterclaims lack merit as a matter of law, we need not decide whether ODOT's procedural argument is well taken. For the same reason, we need not address the constitutional arguments made by defendant and *amicus curiae*.

[3] In a separate bill, House Bill 2128, the legislature provided that, once the location of the light rail and corresponding highway improvements had been determined, Tri-Met and ODOT would manage the construction phases of the light rail project. Or Laws 1991, ch 575, § 5(1). That act was signed by the governor on July 17, 1991, and was effective upon its passage. Section 5(1), codified at ORS 391.150(1), provides that ODOT will "manage and oversee the construction of highway improvements related to the extension of the light rail system." Defendant's property was taken because of necessary highway improvements related to the extension of the light rail system; thus, it was within ODOT's authority, under ORS 391.150(1), to take defendant's property. Defendant does not contend otherwise.

the property further by demolishing the Sylvan Building and constructing a new office building on the site. In December 1990, defendant filed a design review application with Multnomah County, as a first step toward obtaining a building permit.

In January 1991, Mark Hess, a Multnomah County planner responsible for reviewing requests for building permits, telephoned Brett Richards, an assistant project manager in ODOT's "location design group." Hess asked Richards whether ODOT had any plans to acquire, for the Westside Corridor Project, the property on which the replacement building would be constructed. Richards conferred with his supervisor, James McClure, and returned Hess' call. Richards said that ODOT's plans at the time did not require the property. Nothing in Hess' conversation with Richards suggested that the property might be condemned. Richards was aware that what he told Hess would affect defendant's application for the building permit.

If Hess had been aware that the property was slated for condemnation, he would have notified the applicant or the designer of the project that condemnation was possible. If he had known that condemnation was likely for the property, the building permit would not have been issued until the condemnation questions had been resolved between the state and the applicant. Unaware of the possibility of ODOT's taking of the property, Multnomah County issued a building permit to defendant on March 29, 1991.

In fact, ODOT *was* considering the condemnation of defendant's property during the time that defendant's application for a building permit was being processed. One plan under consideration by ODOT from as early as November 1990, known as Option 108, would have placed a roadway immediately next to the Sylvan Building and would have required the taking of the property. ODOT was considering Option 108 in January 1991. On January 14, 1991, Richards asked another ODOT employee for an estimate of what it would cost to take the subject property with the Sylvan Building on it. Richards received an estimate of $1.1 million. On January 18, 1991, Tri-Met and ODOT staff held a joint meeting, at which ODOT employees McClure, Collins, and Richards (along with Tri-Met employees, Multnomah County

employees, and a City of Portland employee) were assigned to deal with the "new office building" on the property.

ODOT abandoned Option 108 in February 1991. On March 30 and 31, 1991, ODOT developed Option 107A, which called for the taking of the Sylvan Building and property. Richards notified Hess of the plan and said that defendant's property would be taken. On or about April 1, 1991, Hess told Richards that a building permit had been issued for the property. Neither Richards nor anyone from ODOT notified defendant that Option 107A called for the taking of its property.

Because implementation of the Westside Corridor Project was a "land use decision," a statutory notice of Tri-Met's proposed final order, concerning the location of the light rail line, was published, and a land use hearing was scheduled. *See* Or Laws 1991, ch 3, § 6 (providing procedure). Defendant acknowledges that that notice was proper. The time and location of the meeting were described in the notice. Pursuant to that notice, Tri-Met held a land use hearing on April 12, 1991. Defendant did not attend. At the hearing, Tri-Met determined the location of the light rail line; the location of the line, with the necessary highway improvements, necessitated the taking of defendant's property.

Demolition of the Sylvan Building occurred on or about May 17 through 19, 1991. On May 21, 1991, McClure sent a memorandum to a subordinate in ODOT, stating: "[T]he abandoned office building [the Sylvan Building] * * * has now been torn down. * * * I would like you to advise the property owner that the property will be [taken]." On May 28, 1991, ODOT informed defendant of its plans for the taking. On August 16, 1991, this condemnation proceeding was initiated.

B. *Affirmative Defenses*

    1. *Equitable Estoppel.*

In its affirmative defense of equitable estoppel, defendant alleged that ODOT falsely and misleadingly represented to defendant, through the Multnomah County Planning Division, that its real property would not be taken, and

that the county thereafter issued a building permit. Defendant alleged that its reliance on ODOT's representation caused it to remove the Sylvan Building and that ODOT was estopped from claiming the nonexistence of the Sylvan Building for the purpose of calculating just compensation. Hewett does not argue that ODOT is estopped from bringing this condemnation action; rather, Hewett argues only that ODOT should be estopped from asserting a specific valuation for the property because of its alleged misrepresentation.

■ This court previously has accepted the general proposition that, under appropriate circumstances, an agency of the government may be estopped to assert a claim inconsistent with a previous position taken by it. *See Belton v. Buesing*, 240 Or 399, 411, 402 P2d 98 (1965) (accepting abstract proposition, but finding no basis for application of doctrine under the specific facts of that case). For estoppel to be established, the party claiming it must (among other things) have relied on the governmental agency's misstatements, and the party's reliance must have been reasonable. *Committee in Opposition v. Oregon Emergency Correc.*, 309 Or 678, 686, 792 P2d 1203 (1990).[4] *See also Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 697, 669 P2d 1132 (1983) (one element necessary for reasonable reliance in a claim for equitable estoppel was that it "was within the lawful powers of the [agency]" to make the statements relied on).

■ Those principles dispose of defendant's estoppel claim here.[5] Upon passage of SB 573 in February of 1991, *only Tri-Met* had the legal authority to determine where the light rail line would go. Or Laws 1991, ch 3, preamble & §§ 3, 6. *See also* Or Laws 1991, ch 3, § 7(1)(a) (requiring local and state governments to "[a]mend their comprehensive or functional plans, including public facility plans, and their land use regulations to the extent necessary to make them consistent with a final order [from Tri-Met setting forth the location of the light rail]"). Under those applicable statutes, Tri-Met had

---

[4] The parties do not dispute those general principles, but dispute only their application in this case.

[5] Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ORCP 47 C.

to determine where the light rail line would go before ODOT could start condemning property for the highway improvements related to the location of the light rail line.

Assuming that the statements made by Richards to Hess in January 1991 (that ODOT's plans *at the time* did not require the property) were inaccurate or misleading when made, defendant could not *reasonably* have relied on them after passage of SB 573 in February 1991. Given the publication of the relevant law and the fact that that law did not permit ODOT to reach a final determination as to what property would be condemned, any reliance by defendant in May 1991 (when it destroyed the Sylvan Building) "was patently unreasonable, precluding estoppel." *See Committee in Opposition*, 309 Or at 686 (stating quoted standard).

Additionally, defendant could not *reasonably* have relied on the alleged representations because of the notice that was published before it acted to demolish the Sylvan Building. Defendant acknowledges that the April 12 meeting was public and that notice of it was proper. The notice effectively told defendant that: (1) the final determination as to where the light rail line will go will be made at the April 12 hearing; (2) Tri-Met, not ODOT, is making that final determination; (3) under plans to be considered at that meeting, the light rail line and concurrent highway improvements are slated to run through your land; and (4) if you do not like this proposal, come to the hearing. Defendant did not attend the hearing. Nonetheless, after notice was published, defendant could not *reasonably* have relied on a prior statement concerning the location of the light rail line. Defendant acted in alleged reliance on ODOT's statements more than a month *after* notice was published.

The trial court did not err when it granted summary judgment to ODOT on defendant's affirmative defense of equitable estoppel. The Court of Appeals did not err in affirming that ruling.

### 2. *"Timing Manipulation" in Violation of Statutes*

As its second affirmative defense, defendant alleged that ODOT violated ORS 281.060(3) and (6), 42 USC § 4651(7), and ODOT's internal policy, when ODOT "deferred

negotiations and condemnation and took other action coercive in nature in order to acquire [defendant's] Property at an unjust and inequitably low price." Specifically, defendant alleged that ODOT had an affirmative, statutory duty to notify it of plans to take the property; that ODOT failed so to notify it; that ODOT knew that it could reduce the cost of the taking by acting in that manner; and that ODOT manipulated the timing of the taking so as to deprive defendant of the value of the Sylvan Building. Defendant refers to this theory as "timing manipulation."

Defendant argues that the cited statutes required ODOT to notify defendant of its plans to take the property, at the latest, immediately after Tri-Met entered its final order (in April 1991) concerning the location of the light rail line. ORS 281.060 provides in part:

"Whenever any program or project is undertaken by a public entity which program or project will result in the acquisition of real property, notwithstanding any other statute, charter, ordinance, or rule or regulation, the public entity shall:

"(3) In acquiring the real property, be guided by the land acquisition policies in section 301 of the 1970 [Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 USC §§ 4601-4655] * * *

"* * * * *

"(6) * * * and take such other actions as may be necessary to comply with the conditions and requirements of the 1970 federal Act * * *."

42 USC § 4651 provides that, when agencies are condemning land, they

"shall, to the greatest extent practicable, be guided by the following policies:

"* * * * *

"(7) In no event shall the head of a[n agency] either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property."

42 USC § 4602 specifies that the provisions of § 4651 create no rights or liabilities and that the federal law does not give rise to issues of valuation in eminent domain proceedings:

"(a) The provisions of section 4651 of this title *create no rights or liabilities* and shall not affect the validity of any property acquisitions by purchase or condemnation.

"(b) Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage not in existence immediately prior to January 2, 1971." (Emphasis added.)

In other words, Oregon law looks to federal law to determine how an agency should go about taking land in certain eminent domain proceedings. The referenced federal law expressly provides no basis for a claim.

Defendant also relies on 49 CFR § 24.102(b), which provides for notification of a property owner "[a]s soon as feasible" when an agency is interested in acquiring real property, and on two paragraphs in Section 8.170 of ODOT's *Right of Way Manual*. The first paragraph of Section 8.170 provides that condemnation "shall be carried out in conformance to" federal and state law. The second paragraph contains the same wording as does 42 USC § 4651(7).

Defendant cannot rely successfully on those sources, because ORS 281.060 provides that, "notwithstanding any other statute, charter, ordinance, or rule or regulation, the [agency] shall" be guided by the federal law. The federal law, in turn, pertinently specifies that its timing policy provisions shall not create rights or liabilities. It would be contrary to the federal law, and thus contrary to ORS 281.060, to use a regulation or internal policy to create such rights or liabilities.

The trial court did not err when it granted summary judgment to ODOT on defendant's affirmative defense of "timing manipulation." The Court of Appeals did not err in affirming that ruling.

## C. *Counterclaims*

### 1. *Misrepresentation*

With respect to its counterclaim for misrepresentation, defendant asserts that ODOT made material misrepresentations, by false statements and by silence. Defendant argues that the false statement that Richards made to Hess in January 1991 — that ODOT had no plans for condemnation of defendant's property — was a misrepresentation. Defendant also argues that, because ODOT knew that defendant was carrying out costly plans for development of the property in reliance on those misrepresentations and failed to inform defendant of the impending condemnation, ODOT's silence was a misrepresentation as well. Finally, defendant argues that it relied on those misrepresentations to its detriment.

■ A claim for misrepresentation requires that there be a representation made with either (a) knowledge of its falsity or (b) awareness of lack of knowledge as to its truth or falsity. *Oksenholt v. Lederle Laboratories*, 294 Or 213, 222, 656 P2d 293 (1982). The "[mis]representation must be *justifiably* relied upon by [the party] in taking action or in refraining from it to his damage." *Meader v. Francis Ford, Inc.*, 286 Or 451, 456, 595 P2d 480 (1979) (emphasis added).

■ As already discussed above, in the circumstances, defendant could not *justifiably* have relied on the alleged misrepresentations. *See* 321 Or at 126-27 (discussing issue of justifiable reliance). Accordingly, defendant failed to establish an element necessary to sustain its counterclaim for misrepresentation.

The trial court did not err when it granted ODOT's motion for summary judgment on defendant's counterclaim for misrepresentation. The Court of Appeals did not err when it sustained that ruling.

### 2. *Inverse Condemnation*

■ Defendant's next counterclaim was for an "inverse condemnation." An inverse condemnation occurs when a governmental entity effectively takes property without actually exercising its power of eminent domain. This court's first detailed discussion of such a claim was in *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 147-51, 248 P2d 703 (1952). In

*Tomasek*, the court stated that "it manifestly would be absurd * * * that the state might destroy the right and protection given the owner of property and evade the payment of just compensation, simply through the medium of failing or refusing to institute condemnation proceedings." *Id.* at 147. More recently, this court has defined inverse condemnation this way:

> "Inverse condemnation is the name given to a cause of action against a governmental agency to recover the value of property which has been taken in fact by the governmental agency, even though there has been no formal exercise of the power of eminent domain. Successful litigation against the governmental agency is a factual determination that there has been a 'taking' and in effect forces the governmental agency to purchase the interest taken. The 'taking' in that case relates back to the date of the beginning of the governmental conduct that is determined to be a 'taking.'" *Hawkins v. City of La Grande*, 315 Or 57, 67, 843 P2d 400 (1992) (quoting Restatement (Second) of Property, *Landlord and Tenant*, § 8.1 comment *d* at 263 (1977) (internal quotation marks omitted)).

The dispositive issue, then, in an inverse condemnation claim is whether property was taken, in fact, *by the government* even though no formal eminent domain proceedings were initiated. Under Article I, section 18, of the Oregon Constitution,[6] a property is taken when there is a "destruction, restriction or interruption of the necessary use and enjoyment of [the] property of a person for a public purpose. Most cases boil this definition down to a test of whether there has been a 'substantial' interference with property rights." *Hawkins*, 315 Or at 68 (citations omitted) (internal quotation marks omitted).[7] Under either formulation, the government

---

[6] Article I, section 18, of the Oregon Constitution, provides in part:

"Private property shall not be taken for public use * * * without just compensation * * *."

[7] The Takings Clause of the Fifth Amendment to the Constitution of the United States provides:

"[N]or shall private property be taken for public use, without just compensation."

The Takings Clause of the Fifth Amendment to the Constitution of the United States is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Nollan v. California Coastal Comm'n*, 483 US 825, 827, 107 S Ct 3141, 97 L Ed 2d 677 (1987).

must interfere with a property owner's rights, and that interference must cause the harm suffered by the property owner.

■    Here, it was *defendant*, not ODOT, that demolished the Sylvan Building. The diminution in value of the property thus resulted from the acts of defendant, not of the government. ODOT's *failure to reveal* its plans to condemn property might, in a proper case, support a claim for misrepresentation or other relief, but that failure does not transform a property owner's actions into actions by the government. Additionally, the *existence* of ODOT's plans to condemn property cannot support a claim for inverse condemnation, as this court's prior cases have explained.

In *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 593-95, 581 P2d 50 (1978), a property owner challenged the validity of a county's zoning plan, on its face and as applied to the landowner's land. The landowner alleged that the zoning regulations adopted by the county had rendered the landowner's property "substantially valueless" and had deprived the landowner "totally of the economic use and benefit" of the property. *Id.* at 608. In part, the landowner argued that the "designation for eventual public use of portions of [landowner's] property" constituted a taking. *Id.* at 610. This court affirmed the trial court's sustaining of the defendant county's demurrer. *Id.* at 614.

In reaching that conclusion, the court said:

> "Whether there has been a 'taking' in this context has never been addressed by this court. It appears that the generally accepted rule is that '*mere* plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of property affected' (emphasis added). Annotation: Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected, 37 ALR3d 127, 132 (1971) and cases cited therein. The annotator summarizes the reasons given for this general rule as follows:

---

Defendant offers no different analysis under the state and federal constitutions. Therefore, we will assume, without deciding, that the analysis is the same. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 572 n 4, 825 P2d 641 (stating same principle), *cert den* 506 US ____, 113 S Ct 467, 121 L Ed 2d 374 (1992).

" '* * * that mere plotting and planning does not, in itself, amount to an invasion of property or deprive the owner of his use and enjoyment thereof; that the projected improvement may be abandoned by the condemnor and the property never actually disturbed; that the threat of condemnation is one of the conditions upon which an owner holds property; and that the general rule is in aid of the growth and expansion of municipalities.' *Id.* at 139-140." 282 Or at 610 (emphasis in original).

*See also Suess Builders v. City of Beaverton*, 294 Or 254, 256-57, 656 P2d 306 (1982) (noting with approval that, in *Fifth Avenue Corp.*, this court stated that "planning for future acquisition as such does not constitute a compensable taking of property").

Defendant's theory can be read to contend that, because ODOT induced it to demolish the Sylvan Building, defendant's act of demolishing its own property was in fact the act of the government, thus meeting that element of a claim for inverse condemnation. Assuming, without deciding, that such an approach is permissible under a claim for inverse condemnation, our answer to defendant's affirmative defense of equitable estoppel and its counterclaim for misrepresentation fully answers the approach in this case. Defendant was not entitled to rely on what it was told, so its act of demolishing the Sylvan Building cannot be transmogrified into an act of the government.

The trial court did not err in granting summary judgment to ODOT on defendant's counterclaim for inverse condemnation. The Court of Appeals did not err in affirming that ruling of the trial court.

### 3. *Condemnation Blight*

Finally, defendant counterclaimed for "condemnation blight." We are aware of only one case from this court in which that phrase appears. In *Lincoln Loan v. State Hwy. Comm.*, 274 Or 49, 51, 545 P2d 105 (1976), this court used the term "condemnation blight" to describe an inverse condemnation action

"against the Oregon State Highway Commission to recover damages for an alleged taking of plaintiff's property in the process of the construction of the East Portland Freeway by

allegedly placing a 'cloud of condemnation' over the property, which resulted in a 'condemnation blight' and a de facto taking, not of the possession of the property, but of a substantial use and benefit thereof.''

■■ Condemnation blight, as discussed in *Lincoln Loan*, occurs when the actions of the government reduce the value of the property before the actual taking. As discussed above, it was defendant, not the government, that reduced the value of the property by demolishing the Sylvan Building.

The trial court did not err in granting summary judgment to ODOT on defendant's counterclaim for condemnation blight. The Court of Appeals did not err in affirming that ruling.

## CONCLUSION

The Court of Appeals erred when it held that any error in the trial court's grant of summary judgment to ODOT on defendant's affirmative defenses and counterclaims was harmless.

On the merits, however, the trial court did not err when it granted ODOT's motion for summary judgment on defendant's affirmative defenses and counterclaims.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the circuit court is affirmed.