Argued and submitted January 29, affirmed May 15, 2003

Sandria ROBERTSON
and Edward Robertson,
*Appellants,*

*v.*

CITY OF TURNER,
a State of Oregon municipal corporation,
*Respondent.*

00C-15510; A113871

69 P3d 738

William L. Ghiorso argued the cause and filed the briefs for appellants.

Bruce L. Mowery argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Plaintiffs brought this action against defendant, the City of Turner, after it closed a hazardous bridge that provided the only motor vehicle access to plaintiffs' residential property. The trial court granted the city's motion for summary judgment, holding that, until plaintiffs had pursued a statutory way of necessity against a third party, their claim was not ripe for adjudication. Because the relevant facts are undisputed, we review only for legal error. We affirm.

Plaintiffs own approximately 20 acres in Turner. Their property lies to the south of a small stream and contains their residence, a horseback riding arena, and a pasture. The only roadway to plaintiffs' property is Gaston Street, which runs approximately 100 yards and connects plaintiffs' driveway to the Fourth Street Bridge. The bridge crosses the stream and connects Gaston Street to the rest of Turner. Although eight parcels of land are served by the bridge, plaintiffs' is the only one with a residence. Between plaintiffs' property and the nearest alternate roadway that could provide access, Wipper Road, lies privately owned, roadless property.

The origins of the Fourth Street Bridge are unclear, but the parties agree that it is now owned by the city. The bridge itself is a rotting wooden plank structure that lacks such normal safety features as rails, and it has incurred significant damage during floods. Consequently, in 1998, the Oregon Department of Transportation (ODOT) recommended that the bridge be either repaired, replaced, or closed. After holding public hearings (at which plaintiffs, among others, testified), defendant adopted an ODOT-approved plan calling for closure.

Defendant informed plaintiffs that the bridge was going to be taken out of service and gave them three options. They could take ownership of the bridge; they could pay the cost of bringing it up to the standards required by ODOT; or they could petition the county for a "way of necessity" to Wipper Road pursuant to ORS 376.155. A "way of necessity" is a "road established * * * to provide motor vehicle access from a public road to land that would otherwise have no

motor vehicle access[.]" ORS 376.150(2)(a). Defendant told plaintiffs that, if they chose that third option, they would be responsible for all associated costs.

Plaintiffs took their options under advisement and continued using the bridge by moving the portable barricades that blocked it. They also initiated this action against defendant, alleging (among other claims not part of this appeal) so-called inverse condemnation, the short-hand description of "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Thornburg v. Port of Portland*, 233 Or 178, 180 n 1, 376 P2d 100 (1963) (citations omitted). In August 2000, before trial, defendant's engineers recommended that defendant take the bridge out of commission completely because it posed a hazard to public safety. After holding more public hearings on the matter, defendant adopted a resolution affirming its earlier decision to close the bridge. Permanent barriers were erected. Thereafter, plaintiffs had no motor vehicle access to Gaston Street or their property.

Defendants moved for summary judgment, contending that defendant's decision to close the bridge was not a taking "for public use," as specified in Article I, section 18, of the Oregon Constitution,[1] but an exercise of defendant's authority to remove a dangerous public hazard, and that plaintiffs' takings claim was not ripe for adjudication. The trial court agreed with defendant's ripeness argument and granted the motion.

If we were to affirm on ripeness, plaintiffs might then seek a way of necessity and thereafter pursue the then-ripe claim. To save plaintiffs that expense and to afford complete relief, we affirm the trial court on a more fundamental ground: Defendant's action in closing the bridge was not an exercise of the eminent domain power to take private property for public use, even if the foreseeable result of the action

---

[1] Article I, section 18, provides: "Private property shall not be taken for public use * * * without just compensation * * *."

was that the value of plaintiffs' property was reduced or eliminated. That being the case, no claim for "inverse condemnation" lies. *See Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 130-31, 895 P2d 755 (1995) ("taking" is predicate for inverse condemnation claim).

Most basically, the interpretation of Article I, section 18, put forward by plaintiffs cannot be derived from or reconciled with that provision's language or its foundational premise. Section 18 guarantees just compensation when "private property" is "taken for public use." Under plaintiffs' theory, government must provide compensation when the use of *public* property is changed and the result is *private nonuse*. To achieve that inversion, plaintiffs argue that defendant's "taking" is the destruction of plaintiffs' own property, because closing the bridge has the incidental effect of eliminating one of plaintiffs' property rights, that is, the right of access to their real estate. In addition, plaintiffs' claim derives from the assumption that their right of access—the private property that government supposedly "takes"—is put to "public use" because the public benefits from its destruction. That reading of Article I, section 18, is at best implausible and at worst an affront to the idea that, generally speaking, words have meanings and sentences drafted by competent speakers of the language convey discrete thoughts—not to mention the idea that the interpretation of a constitutional provision should have some connection to its text.

■ Further, plaintiffs' theory inverts the takings clause's foundational purpose: to guarantee that no individual should have to pay the entire cost of a benefit that is shared by the general public at large. *E.g., Cope v. City of Cannon Beach*, 317 Or 339, 343, 855 P2d 1083 (1993) (quoting *Agins v. Tiburon*, 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980)). Here, the core of plaintiffs' argument is, in effect, that all of defendant's citizens should bear the cost of providing plaintiffs with a private benefit.

■■ Finally, under well-settled Oregon case law, government action affecting private property exists along a continuum. At one end is actual physical appropriation of real or personal property, which obviously is the exercise of the

power of eminent domain and triggers the obligation of just compensation. At the other end of the continuum is the exercise of government's authority to promote the health and safety of the populace—what is commonly referred to as exercise of the "police power."[2] Those exercises are not compensable takings of "private property for public use" under Article I, section 18. *Hughes v. State of Oregon*, 314 Or 1, 34, 838 P2d 1018 (1992); *Eckles v. State of Oregon*, 306 Or 380, 398, 760 P2d 846 (1988), *appeal dismissed*, 490 US 1032 (1989) ("Exercise of the 'police power,' unlike exercise of the 'eminent domain power,' does not require compensation."). As the Supreme Court explained in *Suess Builders v. City of Beaverton*, 294 Or 254, 258-59, 656 P2d 306 (1982):

> "A newly adopted health or environmental regulation may forbid the use of a fuel or the production of certain wastes and thereby cause the closure of a large plant. A tightened safety standard may devastate an investment in expensive machinery or product inventory. New building codes or other rules concerning fire safety or access for handicapped persons may make it uneconomic to maintain a hotel or residential building, with consequent financial loss. Business invests with knowledge of such governmental power to make laws for its conduct, and the balancing of regulatory goals against their economic consequences is the daily stuff of politics rather than of litigation for 'just compensation.' *See Anthony v. Veatch*, 189 Or 462, 494, 220 P2d 493 (1950) (prohibition of 'fixed gear' fishing); *City of Portland v. Meyer*, 32 Or 371, 52 P 21 (1898) (prohibition of slaughter house). Regulation in pursuit of a public policy is not equivalent to taking for a public use, even if the regulated property is land."

(Footnotes omitted.) *See also Thomas v. Dept. of State Police*, 138 Or App 209, 211, 907 P2d 262 (1995) (no taking when state prohibits previously legal gambling device).

The general rule applies even when the government action completely destroys the property on which it exercises its "police power." Thus, demolition of a house for safety purposes is not a taking, *Shaffer v. City of Winston*, 33 Or App

---

[2] Because the authority of the state is plenary, subject to constitutional limitations, there is actually no separate and distinct power to act in support of public health and safety or any other purpose.

391, 394, 576 P2d 823 (1978), nor is confiscation of private property under civil forfeiture laws, *State ex rel Shrunk v. Metz*, 125 Or App 405, 413, 867 P2d 503 (1993).

In the present case, defendant's action does not fall into any gray area between an exercise of eminent domain and exercise of the "police power"; it is clearly the latter. In closing the Fourth Street Bridge, defendant did not physically intrude onto plaintiffs' property. Its action was not a direct regulation of private property. It acted in a purely arbitral capacity, deciding a conflict between plaintiffs' right of access to their property and the general public's right to freedom from hazard. *See Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 612-13, 581 P2d 50 (1978) (quoting *Lutheran Church in Amer. v. City of New York*, 35 NY2d 121, 129, 359 NYS2d 7, 316 NE2d 305 (1974)) (" 'Where government acts in its arbitral capacity, as where it * * * enjoin[s] noxious use, there is simply noncompensable regulation.' "). It enforced a duly enacted quasi-legislative determination that particular property posed a health and safety hazard. In so doing, it did not "take" private property for public use and therefore it need not provide compensation under Article I, section 18.

Affirmed.