Argued and submitted December 2, 2010, affirmed on appeal and cross-appeal
July 20, 2011

# TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON,
an Oregon municipal corporation,
*Plaintiff-Appellant,*

*v.*

# POSH VENTURES, LLC,
a Washington limited liability corporation,
*Defendant-Respondent,*

*and*

# MERRILL LYNCH CAPITAL,
a division of Merrill Lynch Business Financial Services, Inc.,
a Delaware corporation,
*Defendant.*

# POSH VENTURES, LLC,
a Washington limited liability corporation,
*Third-Party Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

# CITY OF PORTLAND,
*Third-Party Defendant-Appellant*
*Cross-Respondent.*

Multnomah County Circuit Court
071214786; A142359

261 P3d 33

Gregory R. Mowe argued the cause for appellant and appellant - cross-respondent. With him on the briefs were Stoel Rives LLP, James N. Westwood, Michelle Rudd, and Reilley D. Keating.

Bruce H. Cahn argued the cause for respondent - cross-appellant. With him on the briefs were Ball Janik LLP, Robert L. Taylor, and Jacob A. Zahniser.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Senior Judge.

ROSENBLUM, S. J.

## ROSENBLUM, S. J.

Plaintiff Tri-County Metropolitan Transportation District of Oregon (TriMet) and third-party defendant City of Portland[1] appeal from a general judgment entered after a jury awarded $756,000 to defendant Posh Ventures, LLC (Posh) for the diminution of value to property owned by Posh. The action, and thus the jury's award, was based on ORS 105.855, which requires a city or mass transit district to compensate commercial property owners for the reduction in fair market value of property caused by restrictions to the street traffic lane adjacent to the commercial property. In this case, the jury found that the city restricted private vehicle access adjacent to a hotel property owned by Posh that diminished the fair market value of the property by $756,000. After the jury verdict, Posh sought attorney fees and costs and the trial court awarded a portion of the fees sought. TriMet appeals from the general judgment, and Posh cross-appeals from the supplemental judgment awarding only a portion of its attorney fees. We affirm.

Unless otherwise noted, the following facts are undisputed. This case arises out of TriMet's construction of the Portland Mall Segment of the South Corridor Light Rail Project in downtown Portland. As part of that project, TriMet constructed a light rail line on SW 6th Avenue and restricted private vehicle access along SW 6th Avenue, including the traffic lane adjacent to property owned by Posh. When TriMet originally identified the need to restrict private vehicle access on SW 6th Avenue next to the property, Starwood Hotels & Resorts Worldwide, Inc. (Starwood) was operating a Days Inn Hotel on the site. The main entrance of the Days Inn was located on SW 6th Avenue, but the hotel also had access from SW 5th Avenue and a secondary entrance to the hotel on SW Clay Street.[2]

---

[1] The legal positions of TriMet and the City of Portland are identical on appeal and the parties are jointly represented, thus, for ease of reference, we refer to the parties jointly as TriMet unless otherwise noted in this opinion.

[2] The access from SW 5th Avenue was also restricted as part of the light rail project, but any issues related to that access restriction were settled separately from this action.

In January 2006, TriMet initially informed the general manager of the Days Inn that TriMet intended to close the hotel's access from SW 6th Avenue. The general manager voiced concerns about the closure and asked TriMet to reconsider, but TriMet confirmed in March 2006 that the access would be closed. A few months later, Posh began to investigate purchasing the Days Inn. In February 2007, Posh and Starwood executed a letter of intent for Posh's purchase of the property for $14 million. Representatives from TriMet and Posh met in April 2007 to discuss the matter. In May 2007, Posh entered into a purchase and sale agreement with Starwood for the Days Inn property. The transaction closed on June 14, 2007. Posh continued to operate the hotel in its then current condition until November 2007, when it closed the hotel to renovate the property with the intent of reopening it as the Hotel Modera.

Although Posh initially believed that a variance might be negotiated to allow continued access from SW 6th Avenue, TriMet quickly confirmed, before the transaction closed, that the decision to close access from SW 6th Avenue was final. Once the planned closure was confirmed, Posh began plans to reconfigure the property in anticipation of the access restriction. In November 2007, Posh began construction on the hotel remodel. To remedy the problems caused by the lost access, Posh turned the SW Clay Street entrance into the main entrance of the hotel by creating a turnaround driveway and porte cochere[3] off the SW Clay Street entrance and reorienting and expanding the hotel lobby to the new entrance. They also "constructed a trash enclosure and other visual screens for the hotel's utilities," converted the parking lot by the old SW 6th Avenue entrance into a courtyard, and added a ramp to the lower parking level to mitigate a traffic flow problem created by the restriction.

In the meantime, TriMet initiated a condemnation action against Posh on December 11, 2007, seeking a temporary construction easement and the permanent vehicle access restriction on SW 6th Avenue. TriMet's complaint

---

[3] A porte cochere is a "passageway through a building or screen-wall designed to let vehicles pass from the street to an interior courtyard[.]" *Webster's Third New Int'l Dictionary* 1768 (unabridged ed 2002).

maintained that the true value of the temporary easement and permanent access restriction was $21,625. In response, Posh filed an answer and third-party complaint against the City of Portland, seeking recovery under ORS 105.855 for the diminution of the property's value resulting from the access restriction.[4]

At TriMet's request, in April 2008, the City of Portland used its police powers to revoke the hotel's access from SW 6th Avenue effective May 1, 2008. Although not entirely clear, it appears that the bulk of the reconfiguration that Posh attributes to the access restriction was completed by May 1, 2008. Hotel Modera opened to the public on June 1, 2008.

Before trial, TriMet amended its complaint to remove the claim for a permanent vehicular access restriction because the city's action had removed the need for that claim, and the parties settled the claim for a temporary construction easement. The parties proceeded to trial on Posh's ORS 105.855 claim. That statute provides:

> "Whenever * * * a city or mass transit district * * * restricts use of the street traffic lane immediately adjacent to a sidewalk abutting commercial property to public conveyances and the existing access to that property by the general public by means of private conveyances is thereby prohibited * * * the city or mass transit district *shall be liable for and shall pay the difference between the fair market value of the property prior to the restriction and the fair market value of the property subsequent to the restriction*, taking into account any special benefits to the property resulting from improvements made by the city or mass transit district in connection with the restriction. The fact that other access to the property from a public way is available shall relieve the city or mass transit district from liability if the other access is reasonably equal to the access prohibited or materially restricted."

(Emphasis added.) The parties presented disparate evidence relating to the change in fair market value attributable to the access restriction, whether the SW Clay Street access was

---

[4] Posh's answer to TriMet's claim alleged that the true value of the property that TriMet sought to condemn was "at least $1,250,000."

reasonably equal to the SW 6th Avenue access, and whether the light rail project provided any special benefits to the property.

The jury concluded that the SW Clay Street access was not reasonably equal to the SW 6th Avenue access and that Posh did not receive a special benefit from the light rail project—findings that are not at issue on appeal. The jury ultimately found that the fair market value of the property prior to the access restriction was $40,220,000 and that the fair market value subsequent to the access restriction was $39,464,000, for a difference of $756,000. TriMet appeals the general judgment and Posh cross-appeals the supplemental judgment, which awarded Posh some, but not all, of its attorney fees.

## THE APPEAL

On appeal, TriMet's assignments of error generally focus on the admissibility of Posh's appraisal evidence about the change in fair market value caused by the access restriction. Therefore, before discussing TriMet's assignments, we briefly summarize that evidence.

Posh presented an appraisal prepared by Robert Greene. Greene, an experienced commercial appraiser, ultimately concluded that the access restriction caused a $2,108,000 reduction in the fair market value of the property. Greene used a three-step process to reach that determination. First, he evaluated whether the SW Clay Street access was reasonably equal to the closed access on SW 6th Avenue. After concluding that it was not, he calculated the fair market value before the restriction and the fair market value after the restriction. He then assessed whether any special benefits accrued to the property from the light rail project. For our purposes, Greene's evaluation of the fair market value "before" and "after" the restriction is at the heart of this appeal.

Generally, there are three standard approaches to property valuation: the cost approach, the comparable sales or market approach, and the income capitalization approach. *City of Bend v. Juniper Utility Co.*, 242 Or App 9, 20, 252 P3d

341 (2011). Greene calculated the "before" value of the property with the income capitalization approach because he felt that it was the most appropriate approach to evaluate hotels purchased as investment vehicles. According to Greene, the income capitalization approach is widely used to appraise income-producing properties. He opined that the income capitalization approach "reflects the market's perception of a relationship between a property's potential income and its market value" by converting the anticipated net income into a value indication through capitalization.[5] A detailed discussion of the formula and figures Greene used to reach a fair market value of the Hotel Modera "before" the access restriction is not necessary for our purposes; what is key is that Greene's appraisal relied on certain "extraordinary assumptions and hypothetical conditions."

Specifically, to determine the "before" value, Greene assumed that the Hotel Modera was remodeled but retained its original SW 6th Avenue access. That is, the Hotel Modera was remodeled, but those changes actually made by Posh during the remodel to transform SW Clay into the main entrance were not made, and the original SW 6th Avenue access still existed. To calculate the "after" value, he assumed that the SW 6th Avenue access was closed, "a new entrance and porte cochere have been constructed and the lobby extended" and that the traffic flow problem was mitigated by construction of an internal driveway ramp to the lower parking garage level.

Greene calculated the "before" value at $40,220,000 based on the income capitalization approach.[6] Greene calculated the "after" value by conducting a "cost to cure" analysis. That is, he determined "the amount that it's going to take to restore the operational function of the hotel property that existed before the access was taken[.]" Accordingly, Greene examined the cost of changing the SW Clay Street entrance into the main entrance, including extending the lobby, constructing a new porte cochere and a new trash enclosure, and

---

[5] The income capitalization approach is based on an analysis of information extracted from the market and provides a comparison of the subject property to other properties of similar character and income-producing ability.

[6] An appraisal entered into evidence on behalf of TriMet also calculated the "before" value of the property at $40,300,000 using the income capitalization approach.

installing a courtyard to replace the parking lot made obsolete by the access restriction. He calculated the total cost for design and construction of those changes at $1,367,000. Greene noted that his cost figure did not include any costs that would be considered a "betterment to the property"— that is, things such as a rooftop garden, marble tile, and a "living wall" that were "a nice thing to do" but not necessary to cure the loss of access. Greene also considered the cost of constructing an internal driveway ramp allowing access from the SW Clay Street entrance to the parking garage, and removing the need for increased staffing and valet services. The total cost of the ramp construction was $741,000.

Greene testified that, under general condemnation law, compensation for the lost access was limited to the lesser of the loss in value to the property or the cost to cure, *i.e.*, a party cannot recover the cost to cure if it exceeds the actual loss in fair market value. Accordingly, Greene also considered whether Posh could have cured the damages due to inferior access to the parking garage by increasing valet service. He calculated that, under the income capitalization approach, such costs would result in a $831,000 reduction in value to the hotel, so, in his appraisal, he used the lesser cost of actually building the internal access ramp. Accordingly, the total reduction in fair market value under Greene's cost-to-cure analysis was $2,108,000.

Greene also opined at trial that, if Posh had not made any changes to the property in anticipation of the SW 6th Avenue closure, the Hotel Modera's fair market value would have been 20 to 25 percent lower than it was after the improvements. That is, if the Hotel Modera only had the SW Clay Street entrance and had made none of the changes that it had made in anticipation of the access restriction, the hotel would have suffered a loss in value that exceeded the $2.1 million that it cost to cure.

To summarize, Greene assumed that the alterations specific to lost access were made after access was restricted, and he used the cost of those alterations to compute a loss in value attributable to the access closure. In reality, Posh made those changes before the access was officially closed.

On appeal, TriMet challenges the trial court's admission of evidence containing hypothetical conditions, the

court's denial of a motion for directed verdict, and the court's jury instructions. All of TriMet's assignments of error, however, rest on the basic premise that ORS 105.855 allows the admission only of evidence that is directly related to the actual physical condition of the property on the day before and the day after the effective date of the access restriction. As already explained, given the timing of Posh's acquisition and remodel of the property, and the effective date of the SW 6th Avenue access closure, Posh's valuation expert relied on extraordinary assumptions and hypothetical conditions to evaluate the change in fair market value caused by the restriction. As described in more detail below, TriMet contends that the trial court had to exclude any evidence that is not related to the actual condition of the property on the effective day of the access restriction. And so, because the Hotel Modera had already been remodeled as of May 1, 2008, and Posh removed access from SW 6th Avenue during the remodel, there was no evidence that showed a change in the physical condition of the property after the access restriction became effective.

Posh acknowledges that the property remodel, including changes attributed to the access closure, was completed by May 1, 2008. Posh contends that TriMet takes too narrow a view of the statute and that, if TriMet's argument wins the day, Posh will be punished for incorporating changes into the hotel remodel in anticipation of the access closure—rather than remodeling the hotel without addressing the lost access and reconfiguring the hotel entrance after the access restriction became effective. Posh asserts that it properly presented evidence to the jury that the access restriction reduced the fair market value of the Hotel Modera by $2,108,000. Posh explains that the evidence, presented primarily by the appraisal and testimony of Greene, used appropriate appraisal methods to calculate the reduced fair market value attributable to the access restriction and it was up to the jury to weigh the evidence and determine damages.

Before trial, TriMet sought to exclude any evidence of "hypothetical value" and "hypothetical alternative designs" of the hotel prior to the access restriction. TriMet argues that, under ORS 105.855, the trial court should have excluded any testimony and evidence not related to the value

of the hotel as "it physically existed before and after the access closure." TriMet contends, therefore, that Greene's appraisal and testimony should have been excluded because his "before" value was based on the hypothetical condition that the Hotel Modera had been developed with access from SW 6th Avenue. TriMet asserts that ORS 105.855 prohibits such evidence. Alternatively, TriMet maintains that the court should have excluded Posh's appraisal evidence as a matter of law because the "hypothetical evidence" allowed the jury to consider evidence that "was so speculative that no rational jury could have awarded damages to Posh under the statute."

We begin with the basic rule of evidence law that

"[a]ll relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law."

OEC 402. Rulings on the admissibility of evidence can contain both legal and discretionary determinations. *State v. Rogers*, 330 Or 282, 311, 4 P3d 1261 (2000). However, where the question is whether a statute precludes the admission of certain evidence, the trial court's evidentiary ruling presents a question of statutory construction that is reviewed for legal error. *State ex rel Carlile v. Frost,* 326 Or 607, 617, 956 P2d 202 (1998). In this case, TriMet asserts that Oregon statutory and decisional law prohibit the type of evidence that Posh introduced to demonstrate the change in fair market value. Therefore, we examine the trial court's denial of TriMet's motion *in limine* for legal error.

Accordingly, we must first determine if ORS 105.855 precludes the type of evidence that Posh introduced. We begin with the statutory language that is central to this dispute. ORS 105.855 provides, in relevant part, that

"the city or mass transit district shall be liable for and shall pay the difference between the fair market value of the property prior to the restriction and the fair market value of the property subsequent to the restriction[.]"

From that text, TriMet concludes that evidence of fair market value must relate directly to the physical condition of the

property on the day before and the day after the effective date of the access restriction. TriMet primarily relies on the legislature's use of "prior to" and "subsequent to" to suggest that the "temporal" aspect of the statute requires a "day before" and "day after" comparison. TriMet also maintains that the statute contains words with a "physical concept" that, when read in conjunction with the temporal aspect, supports its interpretation of ORS 105.855. Specifically, TriMet points to use of the terms "fair market value" and "restriction" in the statute as imparting a "physical" aspect to the analysis. TriMet contends that fair market value is "the present *actual* value of the land" based on the condition of the property at that time and "restriction" refers to a physical restriction "occurring at a particular point in time." According to TriMet, when the temporal and physical aspects of the statute are considered together, it is clear that the legislature intended to limit evidence of fair market value to evidence tied directly to the actual physical condition of the property at the time of the access restriction.

We do not interpret ORS 105.855 so narrowly. The statute requires only that compensation be based on the difference in fair market value before and after the access restriction—in other words, the diminution in value caused by the restriction. Nothing in the statute supports the view that the jury cannot consider evidence of earlier events—specifically, evidence of changes to the property made in anticipation of the access restriction—in determining the diminution in value that was caused by the restriction. As we have previously recognized, "appraisals are commonly predicated upon assumptions and hypothetical conditions." *Dept. of Transportation v. Stallcup*, 195 Or App 239, 252, 97 P3d 1229 (2004), *rev'd on other grounds*, 341 Or 93, 138 P3d 9 (2006). Indeed, accepted treatises of real estate appraisal recognize that "[w]hether or not it is appropriate to use * * * extraordinary assumptions or hypothetical conditions in an appraisal depends on the intended use and nature of the appraisal problem." Appraisal Institute, *The Appraisal of Real Estate* 56 (12th ed 2001).

Nothing in the text or context of the statute suggests that the legislature intended to preclude, across the board, the use of a common and accepted method of appraisal in

determining the "before" and "after" values of property for purposes of assessing the diminution in value caused by an access restriction. Rather, it is for the jury to determine whether use of hypothetical conditions and extraordinary assumptions is appropriate. TriMet was free to present evidence and to argue to the jury that the appraisal method was not appropriate in this case. Allowing the jury to consider evidence of what the "before" and "after" values would have been without the curative changes made by Posh in anticipation of the restriction did not run afoul of the statute.

Nor was that evidence so speculative as to be excluded as a matter of law. The appraisal was based on the cost of changes that were actually made to respond to the access restriction, compared with the costs that would have been incurred had the restriction not been put in place. The nature of the appraisal problem in this case was complicated by the timing of the Posh's purchase of the property, the property remodel, and TriMet's construction of the light rail. As Greene testified, a hypothetical condition was "the only way in this particular case that you can isolate the damage done by the loss of access." Because the statute required a before and after valuation, given the timing of the remodel and the effective date of the restriction, the hypothetical condition was the "only way to do so and capture fair market value." The use of the hypothetical condition and extraordinary assumption was for the jury to consider and give appropriate weight.

TriMet also contends that Posh's use of a "cost to cure" methodology was improper as a matter of law. We recently reiterated that the choice of valuation methodologies in condemnation cases is generally a fact-based inquiry rather than a question of law. *City of Bend*, 242 Or App at 20. That is, the " '[a]ppropriateness of a particular valuation method or combination of methods is not determined by fixed principles of law, but is a factual determination that depends on the record developed in each case.' " *Id.* at 20-21 (quoting *Brooks Resources Corp. v. Dept. of Revenue*, 286 Or 499, 503-04, 595 P2d 1358 (1979)). So, unless a "fixed principle of the law demands otherwise, it is left to the trier of fact to assess the evidence, including expert testimony regarding the appropriateness of a particular valuation methodology, and

to then make a factual call as to the fair market value of the property in question." *Id.* at 21.

In contending that Greene's cost-to-cure analysis was improper as a matter of law, TriMet argues that "Posh married two unrelated appraisal concepts—hypothetical assumption and cost to cure—in an attempt to establish the fair market value of something that never existed." As TriMet points out, cost to cure is generally used in partial takings cases to demonstrate the costs to restore the property that was not subject to condemnation to the "same condition it was in before the taking." *See Tunison v. Multnomah County*, 251 Or 602, 604, 445 P2d 498 (1968). TriMet maintains that, therefore, "[b]y definition, a 'cost to cure' analysis requires the property to have existed in an original condition[.]" TriMet further points to the "general rules of law" that govern the "cost to cure" concept:

> " '(1)  Evidence of the cost of restoring the remaining property as far as possible to its original relative position is admissible only when the evidence of such cost is no greater in amount than the decrease in market value of the property if it is left uncured. In other words, the cost to cure cannot exceed the damage to the remaining property.
>
> " '(2)  It is incumbent upon the owner to offer evidence of the damages suffered by the remaining property prior to offering evidence of the cost of curing such damages.
>
> " '(3)  Evidence offered to establish the prospect of restoring the remaining property to its original condition cannot be speculative. The ability to cure damages to the remaining property must be reasonably certain.' "

(Quoting Julius L. Sackman, 5 *Nichols on Eminent Domain* § 18.18 (rev 2006).)

TriMet contends that Posh failed to comply with those rules and impermissibly linked the cost to cure to a hypothetical assumption. We disagree. Posh offered evidence, through Greene's testimony, that if it had not made any changes to the property in anticipation of the SW 6th Avenue closure, the Hotel Modera's fair market value would have been 20 to 25 percent lower than it was after the improvements. That was sufficient to show that the cost to cure did not exceed the decrease in market value. TriMet's

argument is another way of attacking Posh's use of a hypothetical condition to evaluate the decrease in fair market value attributed to the access restriction, albeit through Posh's use of the cost-to-cure analysis. In light of established law that the appropriateness of a particular valuation methodology is left to the trier of fact to evaluate according to the record involved in a particular case, we reject TriMet's argument on this point. TriMet had the opportunity to present and did present testimony to the jury that the cost-to-cure analysis was inappropriate for use in this case. TriMet has not identified any principle of law that would keep Posh's cost-to-cure analysis from the jury. And we note that the jury did not award the entirety of the damages that Posh attributed to the cost to cure the lost access, awarding only $756,000 of the $2.1 million asserted.

Given our conclusion that Posh's appraisal evidence was properly admitted, we reject TriMet's contention that the trial court should have granted a directed verdict against Posh because Posh failed to present any evidence that the fair market value of the Hotel Modera prior to the access restriction was greater than the fair market value of the Hotel Modera after the restriction. Further, our conclusion also dictates that we reject TriMet's contention that the jury was improperly instructed and allowed to consider evidence other than the physical condition of the property on the effective date of the access restriction.

## THE CROSS-APPEAL

On cross-appeal, Posh argues that the trial court incorrectly limited its attorney fee award to those fees that Posh incurred up to the point in time when TriMet withdrew its condemnation action.[7] In a nutshell, Posh contends that, because it was forced to seek compensation in court for the reduced fair market value of its property, it is entitled to all of its attorney fees and that TriMet cannot avoid liability by withdrawing the condemnation action and relying on the city's police power to close street access.

---

[7] The trial court awarded Posh $45,000 under ORS 35.355 for fees incurred up to the time TriMet amended its complaint to withdraw the condemnation claim. That portion of the award, reflected in the supplemental judgment, is not at issue on appeal.

The success of the argument that Posh makes in its cross-appeal depends on whether *Hewitt v. Lane County*, 253 Or 669, 456 P2d 967 (1969), can be extended to actions brought under ORS 105.855. *Hewitt* involved Lane County's taking of land for highway purposes and the landowner's court challenge to the county's valuation of the land taken. The statutory procedure in ORS chapter 368 (1969) that the county used to take and value the land did not include a provision for attorney fees. The landowner sought attorney fees anyway, and the trial court awarded attorney fees based on its reading of ORS 368.525 (1969) together with ORS 20.085 (1969). ORS 20.085 (1969) provided:

> "In a proceeding brought under section 18, Article I or section 4, Article XI, of the Oregon Constitution by an owner of property or by a person claiming an interest in property, if the owner or other person prevails, he shall be entitled to costs and disbursements and reasonable attorney fees."

The Supreme Court concluded that "[i]n view of the constitutional derivation of the power of the county to take, and of its liability to pay compensation," the legislature enacted ORS 20.085 to "provide substantial equality to landowners whether their lands were taken by condemnation or by inverse condemnation." *Id.* at 671. The court stated that, although proceedings under ORS chapter 368

> "are not the same as inverse condemnation, they are analogous in that the landowner must seek his remedy in court. If the landowner is put to the expense of hiring an attorney in order to realize just compensation for his land, he should be entitled, if successful, to attorney fees in addition to the actual money value of the taking."

*Id.*

This court applied *Hewitt* in *Boggs v. Multnomah County*, 2 Or App 517, 470 P2d 159 (1970), to affirm an award of attorney fees in another case involving a county's condemnation of land for road purposes under ORS chapter 368. In doing so, we explained that, in *Hewitt,* the Supreme Court "held that the county's authority to take land derives from [Article I, section 18, and] ORS [chapter] 368 simply sets out one procedure by which the authority is exercised." *Id.* at 518. Therefore, ORS 20.085 clearly allowed attorney fees and

costs for a landowner who "must seek his remedy in court, whatever the procedure may be, if he prevails." *Id.* (internal quotation marks omitted).

In *Brookshire v. Johnson*, 274 Or 19, 544 P2d 164 (1976), the Supreme Court addressed whether a landowner was entitled to attorney fees under ORS 20.085 when a way of necessity was granted to another landowner pursuant to ORS 376.105 (1975). The court noted that the constitutional basis for the acquisition of a way of necessity was found in Article I, section 18, and that ORS chapter 376 simply presented another way of implementing that constitutional provision. *Id.* at 21-22. The court again applied the reasoning in *Hewitt* and *Boggs* and determined that the servient landowner was entitled to attorney fees under ORS 20.085. In doing so, the court noted that "[t]he underlying constitutional authority for the taking is the same" and the "procedures followed are parallel[.]" *Id.* at 24.

Posh asserts that the reasoning in *Hewitt, Boggs,* and *Brookshire* should be applied to its action under ORS 105.855. Posh maintains that the principle of law to be taken from those decisions is that "[w]hen the government compels a property owner to go to court to seek compensation for reduced property value, the property owner is entitled to his or her attorneys' fees, even if there is no express statutory provision entitling the property owner to his or her attorneys' fees." Therefore, Posh argues, because it was required to go to court to seek compensation for the access restriction, it is entitled to attorney fees despite the lack of an express statutory provision allowing fees. Posh acknowledges that ORS 105.855 does not specifically include attorney fees for the prevailing landowner, but contends nevertheless that the analysis in *Hewitt* applies anytime a party is forced to sue for compensation when its property value was reduced by government action.

TriMet counters that fees are not authorized by ORS 105.855 and that Posh's reliance on *Hewitt* is misplaced. TriMet asserts that, for one, under standard statutory construction analysis, ORS 105.855 clearly does not provide for attorney fees. Second, TriMet contends that the statute applied by the court in *Hewitt*, ORS 20.085 (1969), was much

broader than the statutory provision upon which Posh based its claim for attorney fees, ORS 35.346. Third, TriMet states that the nature of the proceedings in *Hewitt* was "starkly different" than that in this case. That is, *Hewitt* involved an actual physical taking of property and was expressly premised on constitutional principles entitling property owners to just compensation, rather than the use of police power.

We agree that *Hewitt* does not apply to this case. The decisions in *Hewitt, Boggs,* and *Brookshire* have a common thread that is not present in this case—the courts applied ORS 20.085 to proceedings that were based on Article I, section 18, of the Oregon Constitution. That is, the basis of those decisions was the interaction of the underlying constitutional authority for the taking present in each case and the legislature's passage of ORS 20.085 (1969). To the contrary, the city's exercise of its police power to restrict the lanes of travel adjacent to the Hotel Modera is not rooted in Article I, section 18. *See Robertson v. City of Turner,* 187 Or App 702, 707, 69 P3d 738, *rev den,* 336 Or 92 (2003) (noting that the exercise of the government's police power is "not compensable taking[ ] of 'private property for public use' under Article I, section 18"). Therefore, we decline to apply the reasoning in *Hewitt* to a government action that does not "derive from" Article I, section 18.

Affirmed.